**BRYAN CAVE LEIGHTON PAISNER LLP**
Kristin S. Webb (Cal. Bar No. 258476)
*Kristin.Webb@bclplaw.com*
1920 Main Street, Suite 1000,
Irvine, California 92614
Tel.:   (949) 223-7000
Fax:   (949) 223-7100

R. Tyler Goodwyn IV (*Pro Hac Vice*)
*Tyler.Goodwyn@bclplaw.com*
Charles E. Tompkins (P*ro Hac Vice*)
*Charles.Tompkins@bclplaw.com*
1155 F Street, NW
Washington, D.C. 20004
Tel.:   (202) 508-6000
Fax:   (202) 508-6200

Attorneys for Defendant Next Level Ventures, LLC

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHENZHEN SMOORE TECHNOLOGY CO. LTD., | Case No. 2:22-cv-07646-AB-AGR |
| Plaintiff, | **AMENDED ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS TO COMPLAINT FOR PATENT INFRINGEMENT** |
| v. | |
| NEXT LEVEL VENTURES, LLC, and ADVANCED VAPOR DEVICES LLC | DEMAND FOR JURY TRIAL |
| Defendants. | |

## AMENDED ANSWER AND AFFIRMATIVE DEFENSES TO COMPLAINT FOR PATENT INFRINGEMENT AND AMENDED COUNTERCLAIMS OF DEFENDANT NEXT LEVEL VENTURES, LLC

Defendant Next Level Ventures, LLC, ("NLV" or "Defendant")[1] by and through its undersigned counsel, hereby answer Plaintiff Shenzhen Smoore Technology Co. Ltd.'s ("Smoore") Complaint for Patent Infringement ("Complaint") and asserts amended counterclaims and affirmative defenses.

---

[1]     Next Level Ventures LLC is currently registered to do business as ACTIVE, and formerly conducted business as Advanced Vapor Devices/AVD.

**NATURE OF THE ACTION**

1.      NLV admits this case purports to be an action for patent infringement. NLV denies that Plaintiff has stated a legally sufficient claim for patent infringement, and further specifically denies any infringement.  NLV admits that Exhibit A to the Complaint purports to provide copies of U.S. Patent Nos. 10,791,762 ("'762 Patent"), 10,791,763 ("'763 Patent"), D817,544 ("D544 Patent"), D823,534 ("D534 Patent"), and D853,635 ("D635 Patent")(collectively, the "Patents-in-Suit").  NLV denies the remaining allegations set forth in Paragraph 1 of the Complaint.

**PARTIES**

2.      NLV lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 2 of the Complaint and therefore denies these allegations.

3.      NLV admits that it is a Washington state limited liability company with a principal office street address at 3131 Western Ave., Ste. 325, Seattle, WA 38121. NLV further admits that A&A Global Imports Inc. has been a distributor.  NLV denies the remaining allegations set forth in Paragraph 3 of the Complaint.

**JURISDICTION AND VENUE**

4.      Paragraph 4 states a legal conclusion to which no response is necessary. To the extent a response is required, NLV admits that Smoore purports this to be an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 1, *et seq*.

5.      Paragraph 5 states a legal conclusion to which no response is necessary. To the extent a response is required, NLV does not contest subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a), to the extent Smoore purports to bring a civil action arising under the patent laws of the United States.

6.      For this matter only, NLV does not contest that this Court has personal jurisdiction over NLV.  In all other respects, NLV denies the remaining allegations set forth in Paragraph 6 of the Complaint.

7.     Paragraph 7 states a legal conclusion to which no response is necessary. To the extent a response is necessary, NLV does not contest, for this matter only, that the Court has specific jurisdiction over NLV.  In all other respects, NLV denies the remaining allegations set forth in Paragraph 7 of the Complaint, and specifically denies any acts of infringement.

8.     For this matter only, NLV does not contest venue in the Central District of California.  In all other respects, NLV denies the remaining allegations set forth in this Paragraph, and specifically denies any acts of infringement.

## THE PATENTS-IN-SUIT

### A.     *The '762 Patent*

9.     NLV admits that the first page of U.S. Patent No. 10,791,762 (the "'762 Patent"), entitled "Electronic cigarette and method for manufacturing atomizing assembly thereof" identifies October 6, 2020, as a date of patent.  NLV admits that Exhibit A to the Complaint provides a purported copy of the '762 Patent. NLV denies the remaining allegations set forth in Paragraph 9 of the Complaint.

10.     NLV admits that Smoore asserts the '762 Patent has 14 claims, including independent claims 1 and 11, and dependent claims 2-10, 12-14.  NLV admits that Smoore is asserting claims 1, 2, and 7. NLV denies the remaining allegations set forth in Paragraph 10 of the Complaint, and specifically denies any infringement, literally or under the doctrine of equivalents.

### B.     *The '763 Patent*

11.     NLV admits that the first page of U.S. Patent No. 10,791,763 (the "'763 Patent"), entitled "Atomizer capable of preventing liquid leakage caused by air inside a liquid reservoir and electronic cigarette with the same" identifies October 6, 2020, as a date of patent.  NLV admits that Exhibit A to the Complaint provides a purported copy of the '763 Patent. NLV denies the remaining allegations set forth in Paragraph 11 of the Complaint.

12.     NLV admits that Smoore asserts the '763 Patent has 20 claims,

including independent claims 1 and 11, and dependent claims 2-10, 12-20. NLV admits that Smoore is asserting claims 1 and 11. NLV denies the remaining allegations set forth in Paragraph 12 of the Complaint, and specifically denies any infringement, literally or under the doctrine of equivalents.

**C.**    **_The D544 Patent_**

13.    NLV admits that U.S. Patent No. D817,544 (the "D544 Patent"), entitled "Atomizer for electronic cigarette" identifies May 8, 2018, as a date of patent. NLV admits that Exhibit A to the Complaint provides a purported copy of the D544 Patent. NLV denies the remaining allegations set forth in Paragraph 13 of the Complaint.

14.    NLV admits that Smoore asserts that the D544 Patent has 1 claim. NLV admits that Smoore is asserting this claim. NLV denies the remaining allegations set forth in Paragraph 14 of the Complaint, and specifically denies any infringement, literally or under the doctrine of equivalents.

**D.**    **_The D534 Patent_**

15.    NLV admits that U.S. Patent No. D823,534 (the "D534 Patent"), entitled "Atomizer for electronic cigarette" identifies July 17, 2018, as a date of patent. NLV admits that Exhibit A to the Complaint provides a purported copy of the D534 Patent. NLV denies the remaining allegations set forth in Paragraph 15 of the Complaint.

16.    NLV admits that Smoore asserts that the D534 Patent has 1 claim. NLV admits that Smoore is asserting this claim. NLV denies the remaining allegations set forth in Paragraph 16 of the Complaint, and specifically denies any infringement, literally or under the doctrine of equivalents.

**E.**    **_The D635 Patent_**

17.    NLV admits that U.S. Patent No. D853,635(the "D635 Patent"), entitled "Atomizer for electronic cigarette" identifies July 9, 2019, as a date of patent. NLV admits that Exhibit A to the Complaint provides a purported copy of the D635 Patent.

NLV denies the remaining allegations set forth in Paragraph 17 of the Complaint.

18.    NLV admits that Smoore asserts that the D635 Patent has 1 claim.  NLV admits that Smoore is asserting this claim. NLV denies the remaining allegations set forth in Paragraph 18 of the Complaint, and specifically denies any infringement, literally or under the doctrine of equivalents.

19.    NLV lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 19 of the Complaint, and therefore denies these allegations.

## DEFENDANTS' PRODUCTS

20.    NLV admits that it sells oil-vaping cartridges.  NLV admits that Exhibit B attached to the Complaint contains claim charts.  NLV denies that any of their products in the United States infringe the '762 Patent, '763 Patent, D544 Patent, D534 Patent, and/or D635 Patent, or that any of their products practice the identified claims.  NLV denies the remaining allegations in Paragraph 20 of the Complaint.

21.    NLV admits that Smoore identifies AVD C1 Polyresin Oil Cartridges, AVD C2 Glass Oil Cartridges, AVD C3 Eazy-Press Oil Cartridges, AVD C4 All Ceramic Oil Cartridges, and GoodCarts Eazy-Press Glass Oil Cartridges as Accused Products.

## COUNT I: INFRINGEMENT OF THE '762 PATENT

22.    NLV incorporates and reallege their answers to Paragraphs 1-21.

23.    Paragraph 23 of the Complaint states a legal conclusion to which no response is necessary.  To the extent a response is necessary, NLV denies that they are required to have a license or other authorization from Smoore to make, test, use, offer for sale, sell, or import any of NLV's products.

24.    Denied.

25.    Denied.

26.    Denied.

27.    Denied.

28.    Denied.

29.    Paragraph 29 of the Complaint states a legal conclusion to which no response is necessary.  To the extent a response is required, denied.

## COUNT II: INFRINGEMENT OF THE '763 PATENT

30.    NLV incorporates and realleges their answers to Paragraphs 1-29.

31.    Paragraph 31 of the Complaint states a legal conclusion to which no response is necessary.  To the extent a response is necessary, NLV denies that they are required to have a license or other authorization from Smoore to make, test, use, offer for sale, sell, or import any of NLV's products.

32.    Denied.

33.    Denied.

34.    Denied.

35.    Denied.

36.    Denied.

37.    Paragraph 37 of the Complaint states a legal conclusion to which no response is necessary.  To the extent a response is required, denied.

## COUNT III: INFRINGEMENT OF THE D544 PATENT

38.    NLV incorporates and realleges their answers to Paragraphs 1-37.

39.    Paragraph 39 of the Complaint states a legal conclusion to which no response is necessary.  To the extent a response is necessary, NLV denies that they are required to have a license or other authorization from Smoore to make, test, use, offer for sale, sell, or import any of NLV's products.

40.    Denied.

41.    Denied.

42.    Denied.

43.    Denied.

44.    Denied.

45.    Paragraph 45 of the Complaint states a legal conclusion to which no

1  response is necessary.  To the extent a response is required, denied.

2  <u>**COUNT IV: INFRINGEMENT OF THE D534 PATENT**</u>

3  46.    NLV incorporates and reallege their answers to Paragraphs 1-45.

4  47.    Paragraph 47 of the Complaint states a legal conclusion to which no
5  response is necessary.  To the extent a response is necessary, NLV denies that they
6  are required to have a license or other authorization from Smoore to make, test, use,
7  offer for sale, sell, or import any of NLV's products.

8  48.    Denied.

9  49.    Denied.

10  50.    Denied.

11  51.    Denied.

12  52.    Denied.

13  53.    Paragraph 53 of the Complaint states a legal conclusion to which no
14  response is necessary.  To the extent a response is required, denied.

15  <u>**COUNT V: INFRINGEMENT OF THE D635 PATENT**</u>

16  54.    NLV incorporates and reallege their answers to Paragraphs 1-53.

17  55.    Paragraph 55 of the Complaint states a legal conclusion to which no
18  response is necessary.  To the extent a response is necessary, NLV denies that they
19  are required to have a license or other authorization from Smoore to make, test, use,
20  offer for sale, sell, or import any of NLV's products.

21  56.    Denied.

22  57.    Denied.

23  58.    Denied.

24  59.    Denied.

25  60.    Denied.

26  61.    Paragraph 61 states a legal conclusion to which no response is
27  necessary.  To the extent a response is required, denied.

28

## DEMAND FOR JURY TRIAL

62.     NLV also demands a trial by jury on any and all causes of action so triable.

## PRAYER FOR RELIEF

NLV denies that Smoore has a right to any relief in this action.  NLV requests entry of judgment in NLV's favor, and against Smoore on all requests stated in the Complaint.

## AFFIRMATIVE DEFENSES

Further answering the Complaint and as additional defenses thereto, NLV asserts the following defenses.  NLV does not intend to assume the burden of proof with these matters as to which, pursuant to law, Smoore bears the burden.  NLV reserves the right to add additional defenses and/or supplement its defenses, including (but not limited to) those related to unenforceability based upon inequitable conduct, as NLV learns additional facts.  NLV reserves the right to assert all affirmative defenses under Rule 8(c) of the Federal Rules of Civil Procedure, the patent laws of the United States, and any other defense, at law or in equity, that may now exist or in the future be available based upon discovery and further investigation in this case.

## FIRST DEFENSE
## (NONINFRINGEMENT)

NLV has not infringed and does not infringe, directly, indirectly, literally, or under the doctrine of equivalents, any valid, enforceable claim of any of the Patents-in-Suit. Further, Smoore is precluded under the doctrines of disclaimer and prosecution history estoppel from broadening the scope of any claim of the Patents-in-Suit to encompass any NLV product.

## SECOND DEFENSE
## (INVALIDITY, UNENFORCEABILITY, OR INELIGIBILITY)

The claims of each of the Patents-in-Suit are invalid, ineligible, unenforceable, or void for failure to satisfy one or more of the requirements of patentability set forth in

Title 35 of the United States Code, including, but not limited to, 35 U.S.C. §§ 101, 102, 103, 112, and/or 171.

### THIRD DEFENSE

### (PROSECUTION HISTORY ESTOPPEL/DISCLAIMER)

By reason of statements, representations, admissions, concessions, arguments, omissions, and/or amendments made by and/or on behalf of the applicants during the prosecution of the patent applications that led to the issuance of the Patents-in-Suit, Smoore's claims of patent infringement are barred, in whole or in part, by the doctrine of prosecution history estoppel and/or disclaimer.

### FOURTH DEFENSE

### (EQUITABLE DEFENSES)

Smoore's claims are barred, in whole or in part, under principles of equity, including but not limited to the doctrines of waiver, implied waiver, estoppel, equitable estoppel, acquiescence, and/or unclean hands.

### FIFTH DEFENSE

### (STATUTORY LIMITATION ON DAMAGES)

Smoore's claims for damages and/or costs is statutorily limited by 35 U.S.C. §§ 286, 287, and/or 288.  Without limitation, any claim for damages by Smoore is limited by 35 U.S.C. § 287 to only those damages occurring after proper and sufficient notice of alleged infringement of the Patents-in-Suit to NLV.  Any claim for pre-lawsuit damages is barred, in whole or in part, for failure to comply with the marking and notice requirements of 35 U.S.C. § 287.

### SIXTH DEFENSE

### (EXPRESS LICENSE, IMPLIED LICENSE, PATENT EXHAUSTION, AND SINGLE-RECOVERY RULE)

To the extent the evidence so warrants, Smoore's claims are barred, in whole or in part, by express license agreements and/or under the doctrines of implied license, patent exhaustion, or single-recovery rule.  For example, and without limitation,

Smoore's claims for damages for alleged infringement would be limited or entirely foreclosed to the extent that allegedly infringing components and/or products are supplied, directly or indirectly, to NLV by an entity or entities having a license to any of the Patents-in-Suit.  Additionally, Smoore's claims for patent infringement are precluded in whole or in part by direct or implied licenses and/or covenants not to sue that pertain to NLV's or prior assignees' affiliations with any defensive patent trust.

**SEVENTH DEFENSE**

**(NO WILLFUL INFRINGEMENT)**

Smoore is not entitled to enhanced or increased damages for willful infringement because NLV has not engaged in any conduct that meets the applicable standard for willful infringement.

**EIGHTH DEFENSE**

**(NO EXCEPTIONAL CASE)**

Smoore cannot prove that this is an exceptional case justifying an award of attorneys' fees against NLV pursuant to 35 U.S.C. § 285.

**NINTH DEFENSE**

**(ENSNAREMENT)**

Smoore cannot assert its claims under the doctrine of equivalents because any such asserted claim scope would encompass or ensnare the prior art.

NLV's investigation of its defenses is ongoing. To the extent Smoore seeks further information regarding these defenses, Smoore may seek such information through discovery.  NLV expressly reserves the right to amend this Answer to allege and assert any additional defenses, at law or in equity, that may exist now or may be available in the future based on discovery and further investigation in this action.

---

**AMENDED COUNTERCLAIMS**

Pursuant to Federal Rule of Civil Procedure 13, Defendant and Counterclaim-Plaintiff Next Level Ventures, LLC ("NLV"), by way of counterclaims against Plaintiff and Counterclaim-Defendant Shenzhen Smoore Technology Co., Ltd. ("Smoore"), allege as follows:

**NATURE OF COUNTERCLAIMS**

1.      NLV's counterclaims seek declaratory relief, damages, and injunctive relief that arise: (i) under the patent laws of the United States, 35 U.S.C. §§ 1, *et seq*.; and (ii) federal antitrust laws, 15 U.S.C. §§ 1, 2, and 1125.

**THE PARTIES**

2.      Counterclaim-Plaintiff NLV is a Washington state limited liability company with a principal office street address at 3131 Western Ave., Ste. 325, Seattle, WA 98121.  NLV currently conducts business under the name ACTIVE, and formerly conducted business as Advanced Vapor Devices and AVD, all of which are registered names in California and/or Washington.

3.      Based on the Complaint, Counterclaim-Defendant Smoore is a corporation organized under the laws of China having its principal place of business at Block 16, Dongcai Industry Park, Gushu Village, Bao'an District, Shenzhen, China.

**JURISDICTION AND VENUE**

4.      These counterclaims arise under the patent laws of the United States, 35 U.S.C. § 1 et seq., the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 et seq., and Federal Antitrust Laws, 15 U.S.C. §§ 1, 2, and 1125.

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question), 1337 (commerce and antitrust regulations), 1338(a) (any Act of Congress related to patents), 1367(a) (supplemental jurisdiction), and 15 U.S.C. § 15 (suits by persons injured).

6.      This Court has personal jurisdiction over Smoore because it has

committed and continues to commit acts of infringement in violation of 35 U.S.C. §
271 and places infringing products into the stream of commerce, including in this
District. The acts by Smoore cause injury to NLV within this District. Upon
information and belief, Smoore derives substantial revenue from the sale of
infringing products within this District, and derives substantial revenue from
interstate and international commerce.

7. By filing this instant action, Smoore has consented to personal
jurisdiction and venue.

8. Venue is proper in this District under 15 U.S.C. §§ 15 and 22, and under
28 U.S.C. §§ 1391(b) and (c) and 1400(b) because Smoore has committed acts of
infringement and has a regular and established place of business in this district.

## ANTITRUST COUNTERCLAIMS SUMMARY

9. The patent claims Smoore asserts here are merely the latest salvo in
Smoore's years-long battle to unlawfully restrain competition in, and maintain a
dominant share of, the relevant product market for closed cannabis oil vaporizer
systems and components,[2] a market in which Smoore struggles to effectively compete
for several reasons, including Chinese anti-cannabis law.[3]  Because Cannabis is
illegal in China,[4] Smoore, a Chinese company, struggled for years to develop

---

[2]     The market for Closed Cannabis Oil Vaporizer Systems and Components is a
hardware market. Both NLV and Smoore compete in this market.  Closed Cannabis
Oil Vaporizer Systems generally consist of a mouthpiece, a reservoir, and atomizer
assembly. These products are sold by Smoore and NLV to cannabis oil producers
either in their assembled form, or occasionally disassembled in their component
parts.  Cannabis oil producers then add cannabis oil to the otherwise-finished
vaporizer products.
[3]     Smoore's Complaint admits that it participates in the market for closed
cannabis oil vaporizer systems and components, as Smoore alleges that at least any
manufacturer selling such systems or components in a 'not-yet-assembled' form
(mouthpiece, reservoir, and atomizer assembly), would infringe upon Smoore's
design patents. Complaint ¶¶ 51, 59. The Closed Cannabis Oil Vaporizer Systems
and Components market may for convenience hereinafter be referred to as the
"Closed Cannabis Vaporizer Systems Market," the "Cannabis Vaporizer Market" or
other similar terms.  No substantive change to the market definition is intended.
[4]     Chinese law is so strict on this point that Smoore's Annual reports do not
include the word "Cannabis."  Rather, Smoore euphemistically uses the phrase
"vaping products for special purpose" rather than admit that it is involved in the
closed cannabis oil vaporizer and components market. *See* Smoore Holdings Annual

---

knowledge of cannabis products, perform research and development with cannabis oils, and understand the United States cannabis market in the ways required to deliver superior closed cannabis oil vaporizer system technology.

10.    Unable to compete on the merits, Smoore resorted to a variety of anti-competitive and illegal tactics in an effort to maintain its dominant share of the closed cannabis oil vaporizer systems and components market.    These tactics include knowingly fraudulent and abusive patent litigation and unreasonably anticompetitive distribution agreements that are intended to, and do, unlawfully exclude NLV and other competitors from the market. All of Smoore's anti-competitive tactics were designed to, and did, achieve illegally what Smoore could not achieve on a fair playing field: continued dominance and control of the closed cannabis oil vaporizer market.

## **PATENT LITIGATION BACKGROUND**

11.    Since at least 2021, Smoore has pursued enforcement actions in China and the United States to enforce patents that Smoore knew or should have known were unenforceable.    These enforcement actions were brought for the purpose of unlawfully excluding competitors, including NLV.

12.    In 2021, Smoore brought a patent infringement suit in Shenzhen Intermediate People's Court of Guangdong Province, case number (2021)粤03民初5424号    ((2021)Yue(03)MinChuNo.5424),    alleging    that    Shenzhen    Naixing Technology Ltd. Co.("Naixing"), NLV's supplier of vape products, manufactured and sold products that infringed Smoore's Chinese design patent: 201730049185.X, entitled "Electronic Cigarette Atomizer (TH210)". The Shenzhen Intermediate People's Court of Guangdong Province held that Naixing did not adequately establish its defenses.

13.    Naixing appealed the decision to the Guangdong High People's Court,

_____

2022 Report at 17 ("In the U.S. market, the principle business of the Group included the electronic nicotine delivery products and the sales of vaping products for special purpose.").

case number (2022)粤民终4401号 ((2022)YueMinZhongNo.4401). In the appeal, newly discovered evidence was submitted that showed Smoore's U.S. distributor, Jupiter Research LLC ("Jupiter Research"), displayed and offered for sale Liquid 6 products at the Marijuana Business Conference & Expo 2016 ("2016 Expo"). Jupiter Research's display of the Liquid 6 product predated the filing of Smoore's design patent application in China, and thus could invalidate Smoore's patent. Jupiter Research's display was therefore directly relevant to Naixing's non-infringement defense in China of practicing existing designs.

14.    Smoore challenged the authenticity of the new evidence submitted by Naixing and argued that, as it was sourced from outside China, the evidence needed to be notarized within China. After notarized evidence was provided and cross-examination conducted at a hearing, the Guangdong High People's Court required Smoore to respond to specific questions regarding the Liquid 6 product designs. In response to the Court's questions, Smoore claimed "Liquid 6" is a trademark, did not correspond to any specific product design, and that Smoore was unable to confirm what products Jupiter Research displayed at the 2016 Expo. This latter assertion to the Chinese Court was false: as set forth below, Naixing was able to obtain the requested information through discovery.

15.    Unsurprisingly, Smoore did not explain what efforts it made to obtain the Chinese court-requested information from Jupiter Research. For example, Smoore did not address: (1) whether Smoore requested information from Jupiter employee Bob Crompton (who participated at the 2016 Expo); (2) what requests for documents or other information were made, if any, of Jupiter Research; or (3) who at Jupiter Research was contacted regarding these issues prior to responding to the Guangdong High People's Court's requests. Nor did Smoore address the fact that the description of Liquid 6 on Jupiter Research's website indicates that Jupiter's and Smoore's versions of the Liquid 6 cartridge are essentially the same.

16.    Because Smoore failed to fully and accurately respond to the Chinese

Court's inquiry regarding the Liquid 6 products, Naixing was forced to seek discovery in the U.S. directly from Jupiter Research and Mr. Crompton via 28 U.S.C. § 1782. Document and deposition discovery confirmed that, contrary to Smoore's statements to the Chinese Court, Smoore provided the Liquid 6 products displayed by Jupiter Research at the 2016 Expo.

17. Smoore's provision of the Liquid 6 products to Jupiter Research rendered Smoore's Chinese design patent: 201730049185.X, entitled "Electronic Cigarette Atomizer (TH210)," invalid, foreclosing Smoore's effort to enforce that design patent in China, and supporting Naixing's non-infringement defense in China of practicing the prior art. Smoore knew or should have known prior to filing its enforcement action in China that the action was unfounded.

18. Also in 2021, Smoore filed a Complaint with the International Trade Commission (ITC) alleging infringement of three U.S. Patents, including the '762 and '763 Patents, as well as U.S. Patent No. 10,357,623 ("the '623 Patent"). Smoore's Complaint listed 38 Proposed Respondents, which included much of the closed cannabis vaporizer market. The ITC instituted an investigation, *Certain Oil-Vaping Cartridges, Components Thereof, and Products Containing the Same*, Inv. No. 337-TA-1286 (the "ITC Investigation"), by publication of a notice in the Federal Register (86 Fed. Reg. 62567-69) on November 10, 2021.

19. In the ITC Investigation, Smoore accused NLV's AVD C1, C2, C3, and C4 cartridges, and GoodCarts Glass Oil (C2) cartridge—the same cartridges accused here— of infringing the patents asserted in Inv. No. 337-TA-1286.

20. A key patent at issue in the ITC investigation was the '623 Patent, which Smoore asserted to the ITC that all Respondents' accused vaporizer products infringed.

21. During discovery in the ITC Investigation, Respondents learned that Smoore's '623 Patent was improperly obtained by the submission of a materially false declaration to the U.S. Patent Office. The '623 Patent was thus unenforceable.

Smoore should have known of this false declaration before filing its ITC Complaint, and it is beyond dispute that the false declaration became known to Smoore during discovery in the ITC Investigation. Respondents subsequently sought to have Smoore dismiss its '623 Patent from the case, but Smoore continued to assert this patent against Respondents' accused products.

22.    In February 2022, the ITC's Chief Administrative Law Judge ("CALJ") issued an Initial Determination finding:

- Smoore failed to show that its own products practice any claim of its asserted patents and, therefore, Smoore failed to meet the ITC Domestic Industry technical prong requirement necessary for finding a violation of Section 337;

- Smoore improperly relied on its licensees Greenlane Holdings, LLC and Jupiter Research, as well as Jupiter-related companies Standard Farms and Commonwealth Alternative Care, to claim Smoore met the 337 Domestic Industry economic prong requirement. Smoore also overstated the claimed investments of its U.S. Subsidiary, Spectrum Dynamic Research, to support its Domestic Industry Claim;

- Smoore failed to show that NLV's products infringe any claim of the asserted patents;

- NLV's accused products did not infringe the '623 Patent because they are missing at least an absorbent element "being attached to an outside surface of the liquid outlet" or attached to the "outside surface of the outlet-defining element"; the accused outlet-defining element does not reduce the size of the liquid outlet;"

- The '623 Patent was unenforceable because a materially false declaration was knowingly submitted to the U.S. Patent Office in support of an effort to obtain the '623 Patent;

- NLV's products do not infringe the '762 Patent because they are missing at least a "heating element embedded in an interior of the liquid absorption element, wherein an edge of the heating element is internally tangent to the atomizing surface"; and "a power source assembly connected to the atomizing assembly;"

- NLV's products do not infringe the '763 Patent as they are missing at least "a mouthpiece assembly."

A public copy of the Initial Determination is attached hereto as Exhibit 2. *See* Exhibit 2 at 55-75, 94-102.

23.    Notwithstanding the ITC's determination, on October 19, 2022, Smoore filed this instant District Court Action, alleging that NLV has infringed, and is

infringing, one or more claims of U.S. Patent Nos. 10,791,762 ("'762 Patent"); 10,791,763 ("'763 Patent"); D817,544 ("D544 Patent"); D823,534 ("D534 Patent"); and D853,635 ("D635 Patent") (collectively, the "Patents-in-Suit."). The Action was stayed pursuant to 28 U.S.C. § 1659(a) pending a final determination in the ITC Investigation, and the stay lifted in March 2024.

24.    Smoore understandably did not seek to enforce the fraudulently-obtained '623 Patent here. The damage, however, was done: Smoore's efforts to enforce the fraudulently-obtained '623 Patent substantially damaged both NLV and competition in the closed cannabis oil vaporizer systems and components market as a whole.

## UNITED STATES MARKET BACKGROUND

25.    In 2012, the floodgates opened. After decades of full criminalization followed by years of limited steps to legalize cannabis for medical use, two states (Colorado and Washington) legalized the recreational use of cannabis at the state level. Alaska, Oregon, and Washington, D.C. would follow in 2014, and California, Nevada, Massachusetts, and Maine in 2016.

26.    In just a few short years, cannabis had been effectively legalized in state markets across the country. This rapid change in policy left many previously barred entrants rushing to get a piece of this newly legal market for cannabis and cannabis-related products.

27.    The rush to enter this new market was not limited to cannabis producers. The wave of cannabis legalization also led to booming interest in new forms of cannabis consumption, including through the use of vaporizer technology. When cannabis was widely illegal in the United States, development of cannabis consumption methods was limited by the lack of professionalized cannabis producers investing research and development efforts into improving existing cannabis consumption methods. After legalization, cannabis producers looked for innovative ways to improve the cannabis experience for consumers, including through wider use

of cannabis oils for use in vaporizers.

28.    Vaporizer manufacturers like Smoore rushed to join this newly booming market.  However, existing vaporizer technology at the time was created for use with nicotine rather than cannabis oils. Liquids containing nicotine are not viscous and are homogenous, whereas cannabis oils are less stable, more viscous, and less homogenous.  It is thus difficult to leverage nicotine vaporizer technology into the closed cannabis vaporizer market without substantial improvements.   For example, many early vaporizer manufacturers used cotton wicks, which had an unpleasant taste, burned oil, and had the potential for leaks and clogs.

29.    Plaintiff/Counter-Defendant Smoore was an early entrant into the market for closed cannabis vaporizer and component technology, selling vaporizers with a ceramic heating component into the US market through distributors at least as early as 2016.

30.    Smoore in its financial reports claims that it has invested in research and development for closed cannabis vaporizer systems and components specifically for designed for cannabis consumption and delivery -- what Smoore calls "vaping products for special purpose."[5] "Special purpose" is Smoore's euphemism for cannabis.

31.    As a result of Smoore's early entrance into the closed cannabis vaporizer systems market, Smoore grew quickly to amass a dominant market share of more than 80%.

32.    However, Smoore's dominant market position masked serious weakness with Smoore's products. As the market matured, Smoore's customers demanded higher-quality closed cannabis vaporizer products tailored specifically for cannabis oil, rather than products designed for nicotine liquids.

---

[5]    *See* Smoore Holding's 2022 Annual Report ("During the Review Period, we made satisfactory progress in research and development ("R&D") investment, particularly in new heating element technology, ***special-purpose vaping devices*** and aerosol drug delivery devices, etc., laying a solid foundation for the long-term competitiveness of the Group." (emphasis added).

33.     Competing closed cannabis vaporizer system technology companies began to take advantage of Smoore's failure to keep up with this market demand for higher-quality closed cannabis vaporizer system products. Competitors, including NLV, invested heavily in research and development to create vaporizer products tailored to the unique characteristics of cannabis oil. These efforts included experimenting with different materials, specifications, and technologies that could improve user experience and reliability.

34.     Beginning around 2018 or 2019, Smoore began losing market share to these upstart American competitors, who could experiment directly with cannabis oil in ways that Smoore, as a Chinese company with Chinese research and development operations, could not at the time.

35.     Even as the market for cannabis vaporizers was growing, with sales as much as doubling between 2020 and 2022, Smoore's market share began to erode. Between 2018 and 2023, Smoore's market share for its CCELL products dropped from over 80% to approximately 50-60%.  Smoore's abusive patent litigation and attempted enforcement of the fraudulently-obtained '623 patent were undertaken in an effort to stop further market share erosion. Smoore's anticompetitive patent litigation and efforts to exclude NLV and others from the U.S. closed cannabis vaporizer systems market effectively slowed the rate at which Smoore lost market share, and enabled Smoore to maintain a dominant share of the market.

36.     Faced with this rapid decline in fortunes and its inability to keep up with research and development in the industry, Smoore undertook a plan to suppress and eliminate competition in the market for closed cannabis vaporizer systems technology.

37.     Smoore's plan was two-fold: (1) abuse the legal systems of both China and the United States by misusing intellectual property rights to exclude smaller competitors from the market; and (2) use early market power in the U.S. to exclude smaller competitors by enforcing abusive and exclusionary distribution agreements

1  in the United States.  These tactics enabled Smoore to vastly slow the pace of its
2  precipitous market share loss and maintain monopoly power in the closed cannabis
3  vaporizer systems market.

4  **Smoore's Unlawful And Exclusionary Patent Litigation**

5  38.  Smoore markets itself as the "world's leading atomization technology
6  company"[6] and "the world's largest vaping technology manufacturer."[7]  Smoore has
7  been the world's largest atomization device manufacturer since 2019.[8]  Smoore,
8  through its CCELL brand, now advertises its products specifically for use with
9  cannabis oils.[9]

10  39.  Smoore's social media advertises its CCELL brand's involvement in the
11  cannabis industry, including various recent postings related to CCELL marketing
12  efforts at San Francisco Hash Week,[10] a cannabis industry event.  Smoore's
13  marketing efforts also include re-posting an Instagram post by a user named
14  "smokemycannabis" containing images of a CCELL-branded closed cannabis
15  vaporizer system which tagged the CCELL Instagram account and used the hashtag

---

[6]  *See* https://en.smooreholdings.com/, last accessed May 20, 2024.
[7]  *See* https://en.smooreholdings.com/about/, last accessed May 20, 2024.
[8]  *See* https://en.smooreholdings.com/about/, last accessed May 20, 2024.
[9]  *See* CCELL Vape Cartridges: Choose the Best for Your Brand, July 19, 2024, https://www.ccell.com/blogs/ccell-vape-cartridges-choose-the-best-for-your-brand (last accessed October 2, 2024) ("Choosing the right cartridge enhances flavor and vapor quality, and ensures compatibility with various cannabis oils like live rosin, liquid diamonds, and traditional distillates. In this blog, we'll explore CCELL's vape cartridges, advanced heating elements, and why they are the best choice for your brand.").
[10]  *See* https://www.instagram.com/reel/C_frN4HNxFQ/?utm_source=ig_web_copy_link&igsh=MzRlODBiNWFlZA==, last accessed October 3, 2024.

1    "#Cannabis."[11] Screenshots of this Instagram post are below.

2
3
4
5
6
7    
8
9
10
11
12
13
14

15
16
17
18
19    
20
21
22
23
24
25
26

27    [11]    See                                                                    https://www.instagram.com/p/C-
28    4DjHtJ6cA/?utm_source=ig_web_copy_link&igsh=MzRlODBiNWFlZA==,    last
accessed October 3, 2024.

40.     Smoore also advertises its vaporizer products extensively on the "High Times" website and in the "High Times" magazine, both of which (as the name suggests) target cannabis users. Smoore even sponsored the "High Times" 100 Gala on May 24, 2022, which is "an annual event honoring 100 of the most influential people in the cannabis industry."[12]

41.     As the ITC recently found, a key patent asserted by Smoore related to its "atomization technology" was fraudulently obtained by a Smoore employee in the Intellectual Property department.   Smoore nevertheless aggressively pursued litigation to try and enforce its fraudulently obtained patent.  Smoore's aggressive litigation efforts drove several would-be competitors out of the closed cannabis vaporizer market.

42.     Smoore has similarly abused Chinese patent law, and still insists that its design patent is valid, despite evidence showing that its claimed design was publicly used and disclosed in 2016, which was before Smoore even filed its Chinese design patent application that led to the design patent at issue.

43.     As discussed above, Smoore filed a Complaint at the ITC listing numerous Respondents, including NLV. Smoore's complaint alleged that the defendants, including NLV, imported products into the United States that infringed upon three of Smoore's patents for oil-vaping cartridges, two of which are at issue in this case.

44.     As the ITC found, in late 2014 and early 2015, Smoore, through an employee of its intellectual property department named Wenjian Qi, learned of an abandoned patent application submitted by inventor Xiaolin Fang. Qi and Fang reached an agreement whereby a company headed by Mr. Qi's wife would purchase the abandoned application. Qi then worked with a patent prosecutor to revive the patent application by fraudulently asserting that the delay in filing the reply to the

---

[12]     *See*     https://www.ccell.com/news/ccell-sponsor-hightimes100-gala,     last accessed October 3, 2024.

notice of abandonment was unintentional. After the patent ('623) was issued from continuations of this application, Smoore purchased the patent from the company headed by Mr. Qi's wife. Ex. 2 at 91-92.

45.    On October 4, 2021, Smoore filed its complaint with the ITC alleging infringement of the fraudulently obtained '623 patent. The complaint listed 38 Respondents, all of which were entities substantially smaller than Smoore.

46.    During the course of the investigation, at least 12 Respondents were terminated based on consent orders. Another two Respondents were terminated based on withdrawal of allegations in the complaint. Six more Respondents were found in default. On information and belief, a number of these parties entered into agreements with Smoore to resolve the allegations in the complaint by exiting the market. At least three of the original Respondents, and likely more, appear to have since gone out of business entirely.

47.    As discussed above, in February 2022, the ITC's CALJ Clark S. Cheney issued an Initial Determination that the Respondents' accused products did not infringe Smoore's asserted patents and had not violated international trade law, at least in part due to Smoore's actions of: (1) fraudulently obtaining the '623 patent and (2) wrongfully using the ITC by misrepresenting Smoore's participation in U.S. commerce in an effort to satisfy the economic prong of the ITC's domestic industry requirement.

48.    Specifically, the CALJ found that: "There is only one conclusion that a reasonable factfinder can draw from this record evidence: [patent prosecutor] Mr. Cheng knowingly submitted a false declaration about the reason the '553 application [leading to the '623 Patent] was abandoned. I so find."[13]  Thus, the CALJ found that Smoore's '623 Patent was obtained by knowingly submitting a false declaration.

49.    Further, Smoore improperly relied on its licensees, who were mere importers, and those licensees' related companies -- as opposed to Smoore's

---

[13]    Ex. 2, ITC Initial Determination (Public Version) page 93.

activities -- and overstated Smoore's investments in its U.S. Subsidiary to claim that Smoore met the economic prong of the ITC's Domestic Industry requirement.[14]

50.     For all three patents asserted in the ITC investigation, NLV was found not to be in violation of Section 337 of the Tariff Act by importing and selling oil-vaping cartridges.

51.     Smoore knew or should have known that its '623 Patent was obtained fraudulently. Smoore also should have known before filing its Complaint at the ITC that relying on Smoore's distributors and Smoore's insignificant investment in its U.S. subsidiary were inadequate to meet the ITC's Domestic Industry economic prong requirement. Despite this, Smoore continued to pursue litigation to drive out competitors, and demanded settlements that were intended to, and did, exclude competitors from the market.   Smoore's abusive litigation both unreasonably restrained competition in the closed cannabis vaporizer systems market by driving out competitors and damaged NLV by forcing NLV to expend substantial resources defending a case that Smoore knew or should have known was baseless from the start.

52.     Undaunted by its ITC loss, Smoore is now attempting to re-litigate two of the patents at issue in the ITC Investigation (the '762 Patent and the '763 Patent), along with three design patents.

53.     In addition to the ITC Investigation, as discussed above, Smoore has also been engaged in a design patent dispute in China against NLV's supplier, Naixing. In that case, Smoore evaded acknowledging, by providing misleading responses to the Chinese Court's questions, that it had supplied its distributor Jupiter Research certain products for display and offer for sale at a conference in Las Vegas in 2016. Smoore's early disclosure of these products (the "Liquid 6") to Jupiter Research, before the filing of Smoore's design patent application claiming the same design, would invalidate Smoore's Chinese design patent and provide a non-

---

[14]     *Id*. at page 95-101.

1    infringement defense for Naixing.

2        54.    However, Naixing has since uncovered evidence that Smoore's

3    misleading responses to the Chinese Court's questions were false, as shown by video

4    from the conference in question. As one of the patents asserted in this case is based

5    on the Chinese patent at issue in that case, Smoore's false written representation in

6    the Chinese patent litigation continues their pattern and practice of abusing tribunals

7    for anticompetitive purposes.

8        55.    Despite the significant evidence that at least two of its patents (the '623

9    Patent and Chinese design patent) were invalid due to fraud and false statements,

10   Smoore has continued its course of conduct of using these patents, including the five

11   patents at issue in the Complaint, with the goal of wrongfully excluding competitors

12   from the market.

13       56.    Smoore's pattern and practice throughout these various patent litigation

14   actions has been to assert patents that Smoore knew or should have known were

15   invalid or unenforceable in order to force smaller competitors out of the market by

16   entering into exclusionary settlement agreements.

17       57.    As a result of Smoore's conduct in pursuing this litigation, NLV has

18   been forced to spend more than $3 million to defend against the various actions

19   instituted by Smoore.

20       58.    Smoore has additionally used the threat of this abusive patent litigation

21   to poach NLV's customers. Smoore and its distributors contacted NLV's customers

22   questioning NLV's viability as a business due to Smoore's patent litigation, including

23   one major customer who demanded written assurances from NLV. While NLV did

24   its best to reassure this customer that Smoore's allegations were meritless, the

25   customer decided to diversify its supply sources as a direct result of Smoore's threats.

26   This customer now buys some portion of its closed cannabis oil vaporizer system and

27   component products from Smoore in addition to the products it buys from NLV.

28   Smoore's attempt at using its abusive patent litigation as an economic coercion

mechanism aimed at NLV's customers was successful, and NLV lost business as a result.

## Smoore's Distributor Agreements

59.    Smoore, through its CCELL brand, distributes its closed cannabis vaporizer system products (the systems and components) by selling directly to both cannabis oil producers and, primarily, through distributors.

60.    Smoore attempts to use its distribution agreements to limit competition for closed cannabis vaporizer systems and components.

61.    Smoore and its distributors met in person to establish and reconfirm their commitment to the anticompetitive provisions in Smoore's distribution agreements.    For example, on information and belief, in 2019, Smoore and its distributors met in person in Los Angeles.    At this meeting, Smoore and its distributors confirmed that the terms of their distribution agreements prevented the distributors from competing with one another or Smoore.    There were other similar meetings between Smoore and its distributors.

62.    On information and belief, Smoore and its distributors have agreed to include the  following terms in Smoore's distribution agreements:

- Exclusivity: CCELL distributors are forbidden from selling competing vaporizer products. In a nascent market, this forecloses market entry for smaller potential entrants.
- Mandatory Price Guidelines: CCELL distributors must sell at CCELL-approved pricing.
- Banned Competition: Distributors are banned from selling to existing customers of CCELL or other distributors.
- Security Deposits: CCELL requires a security deposit and will deduct money for violations of the mandatory price guidelines.
- Required Monthly Monitoring Reports: Distributors must provide customer lists and prices to Smoore every month.
- Required Monitoring for Copied Products: Distributors must combat copied products.

63.    Rather than a simple restriction to improve and/or simplify Smoore's

distribution process, these restrictions serve to reduce both intra-brand and inter-brand competition for closed cannabis vaporizer systems and components. Moreover, because Smoore also sells its products directly to customers, Smoore's distribution agreements effectively are horizontal agreements that, by definition, unreasonably limit competition.

64.    Smoore's distribution agreements explicitly and implicitly restrict distributors from competing with either Smoore or other entities selling Smoore vaporizers and forbid competition between Smoore-authorized distributors and Smoore itself.

65.    Smoore-authorized distributors are also forbidden from selling competing vaporizer products, including NLV products.  Smoore's distribution agreements thus are intended to, and do, unreasonably exclude NLV from the market and restrain NLV's participation in the closed cannabis oil vaporizer systems market.

66.    Smoore also instituted mandatory wholesale price guidelines to restrict competition. Smoore instituted a security deposit system pursuant to which Smoore would deduct money for violations of these mandatory price requirements. These mandatory prices, along with the non-solicitation agreements, ensured that cannabis oil producers and other purchasers paid higher prices for closed cannabis vaporizer systems than they otherwise would have absent these agreements.

67.    These agreements also effectively required the distributors to sell at prices at or above the prices at which Smoore – a competitor as well as manufacturer – sold its cannabis vaporization technology into the closed cannabis vaporizer systems market.

68.    Smoore and its distributors policed their restrictive agreements. Specifically, Smoore required distributors to exchange market condition information – including price information -- with each other and with Smoore on a monthly basis. These reports were mandatory.  These mandatory information exchanges allowed Smoore and its distributors to collectively police their unlawful agreement.

69.    In addition to price, Smoore also required that distributors report their customer lists on a monthly basis. This was to ensure that Smoore and its distributors could police their restrictive agreements to prevent competition and increase prices to closed cannabis oil vaporizer systems customers.

70.    Smoore also created a formula for assessing its distributors. One important factor in this assessment was cooperation with Smoore's restrictions on competition.

71.    Smoore also required its distributors to help combat copied products, including providing copies of such products to Smoore. On information and belief, this provision was included not to protect Smoore's intellectual property rights, but rather as a pretext to further reduce competition in the market for closed cannabis vaporizer system products.

72.    Smoore actively engaged in policing competition in the market for closed cannabis vaporizer system products. If Smoore thought a distributor was engaging in competition, for example by selling products to an existing Smoore customer, Smoore would send a communication to the distributor to stop the competitive conduct and no longer sell to Smoore's pre-existing customer.

73.    Smoore and its distributors produced instructional training materials for use in training the distributors' employees. These materials included express instructions that sales personnel at the distributors were prohibited from competing for customers of other CCELL distributors.

74.    Smoore's distributors understood this to be an anticompetitive agreement between the distributors horizontally. If one distributor thought another distributor was attempting to compete, the distributor would contact Smoore and ask Smoore to enforce the agreement between competitors by warning the other distributor against competing. Smoore has acted at the behest of its distributors to stop nascent competition by prohibiting other distributors from selling to pre-existing customers.

75.    As a result of Smoore's collusive and coercive distribution agreements, including the minimum resale price maintenance provisions, NLV has been foreclosed from accessing distribution opportunities in California and elsewhere.

76.    Specifically, NLV's products were previously distributed by Greenlane Holdings, which merged with KushCo Holdings. When the merger was completed in 2021, Greenlane dropped NLV's products and became an exclusive distributor of Smoore's products. NLV was therefore foreclosed from an important distribution opportunity with one of the largest closed cannabis vaporizer systems distributors in the United States.

77.    Prior to the Greenlane/KushCo merger, sales from NLV to Greenlane were already in the millions of dollars and expanding rapidly. As a result of Smoore's efforts to foreclose access to the market, NLV directly lost millions of dollars in annual sales to this distribution channel. As Greenlane has relationships with different cannabis oil producers than NLV, NLV was also foreclosed from accessing those Greenlane customer relationships.

78.    The total U.S. market for closed cannabis vaporizer systems was estimated to be around $700 million in 2023, which is more than double the estimated market size in 2019.   The four major CCELL distributors (Jupiter Research, Greenlane Holdings, 3WIN Corp., and CannaBrand), which account for most of Smoore's sales in the U.S., held market shares matching Smoore's approximately 80% market share in 2019.   Smoore's anticompetitive agreements with these distributors effectively slowed Smoore's market share decline and allowed Smoore to exclude NLV and other market entrants from the vast majority of the market between 2019 and 2023.

79.    As a result of this market foreclosure, NLV was forced to maintain additional costly sales and distribution infrastructure, including a network of salespeople and physical infrastructure such as warehouses to hold inventory which would otherwise be held by distributors. As another example, NLV now spends

millions per year in trade marketing, including tradeshow attendance. If NLV were able to access distribution networks, distributors would also provide trade marketing and show NLV's products at these trade shows, saving NLV significant marketing expenses. NLV also now has significant inventory carrying costs as inventory which would otherwise be held by distributors is now held by NLV.

80.    As a result of Smoore's exclusionary conduct, NLV's opportunity to expand its sales rapidly to achieve economies of scale was significantly limited. Had NLV achieved economies of scale by accessing the foreclosed distribution channels, NLV would have been able to expand its sales more rapidly and lowered its product cost per unit. Instead, NLV was forced to make significant investments in sales and distribution infrastructure and personnel which prevented NLV from scaling up as quickly as it would have, had NLV been afforded access to this distribution network.

81.    As the market for cannabis vaporizer systems and components is an emerging market, personal relationships are an important factor in obtaining sales volume. NLV was foreclosed from access to distributors' personal relationships with cannabis oil producers, which further hindered NLV's growth.

82.    Smoore's exclusionary conduct meant that all major distributors were "locked up" and NLV was prevented from accessing distribution networks for its products. Smoore's anticompetitive conduct prevented other manufacturers of Closed Cannabis Vaporizer Systems and Components from reaching economies of scale, thus driving up costs for these products nationwide.

**Interstate Commerce**

83.    Plaintiff/Counter-Defendant Smoore sells cannabis vaporizers in the closed cannabis vaporizer systems market in the United States in a continuous and uninterrupted flow of interstate commerce, including in this District.

84.    Smoore's business substantially affects interstate commerce in the United States and affects a substantial volume of trade and commerce in various states in the United States.

85.    Smoore sells closed cannabis vaporizer systems in the United States. Smoore's business substantially affects interstate commerce and has caused antitrust injury to NLV and consumers in the United States.

86.    CCELL, which Smoore claims is "a technology brand and global innovator in the portable vaporizer space that revolutionized the industry by introducing the ceramic heating component,"[15] was established by Smoore in 2016 and has since become one of the world's largest vaporizer suppliers.[16]    Smoore, through its CCELL brand, sells wholesale closed cannabis vaporizer systems and components to producers of cannabis oil in the United States, including in this District. The cannabis oil producers then sell these closed cannabis vaporizer systems devices to retail outlets and consumers through various retail methods.

87.    Defendant/Counterclaimant NLV also sells closed cannabis vaporizer systems and components to producers of cannabis oil, and thus competes in the same market for wholesale closed cannabis vaporizer systems hardware for cannabis oil. Neither Smoore, through CCELL, nor NLV produce cannabis oil or other products containing cannabis.

**The Closed Cannabis Vaporizer Systems Market**

88.    Closed Cannabis Vaporizer Systems and Components are a highly specialized product utilized by a core group of sophisticated cannabis oil producers and consumers whose preferences are strong enough to constitute an independent antitrust market.

89.    Cannabis (marijuana) refers to "the dried leaves, flowers, stems, and seeds from the Cannabis sativa L plant. The plant contains the [...] chemical THC and other similar compounds. Extracts can also be made from the cannabis plant."[17]

90.    Cannabis can be sold as a solid, usually either as resin or as dried plant

---

[15]    *See* https://www.ccell.com/news/ccell-launches-environmentally-conscious-eco-star-aio-vaporizer, last accessed May 20, 2024.
[16]    *See* https://www.ccell.com/about-ccell, last accessed May 21, 2024.
[17]    *See* https://nida.nih.gov/publications/drugfacts/cannabis-marijuana, last accessed May 23, 2024.

material, can be mixed into food products and sold as ingestible products (often called "edibles"), or can be extracted into oils and waxes.

91.     Products designed for cannabis inhalation generally fall into two categories: smoking products and vaporizer products. While smoking products rely on combustion to produce smoke that is inhaled into the lungs, vaporizer products do not involve either burning or smoking.  Rather, vaporizer products vaporize or aerosolize the cannabis.

92.     Vaporizer systems are not generally interchangeable with other methods of consuming cannabis, including smoking and edible consumption. Vaporizers are generally regarded as less harmful than smoking products, as vaporizers do not entail the inhalation of smoke, which can include carcinogens.  Vaporizer products are more discreet and easier to use than smoking products, and can be used in a variety of circumstances in which smoking generally is prohibited or frowned upon.

93.     Edibles are absorbed in the body differently than smoked or vaporized cannabis, and therefore offer a different experience than is obtained by smoking and vaporization.  Smoking is seen as more harmful to health than vaporizer systems, is less discreet, and requires more consumer familiarity with cannabis use than vaporization.

94.     Cannabis vaporizers include both open and closed cannabis systems. In an open cannabis vaporizer system, the cannabis consumer separately purchases cannabis without a reservoir, such as dried cannabis plant material, which is then inserted into a vaporizer device by the consumer. In a closed cannabis vaporizer system, the consumer purchases both the cannabis product and the reservoir, which is pre-filled by a cannabis producer.

95.     Closed cannabis vaporizer systems are often much smaller than open cannabis vaporizer systems and can thus be consumed discreetly. While open cannabis vaporizer systems may require further processing of cannabis products, such as grinding cannabis plant material into smaller pieces, closed cannabis

vaporizer systems require no further processing. Open cannabis vaporizer systems are not reasonably interchangeable with closed cannabis vaporizer systems because they lack the unique characteristics of closed cannabis vaporizer systems, including ease of use and discreet consumption methods.

96.    Closed cannabis vaporizer systems also offer other advantages because they come in multiple forms, including cartridges, pods, and "all-in-one" systems. The cannabis reservoir, or the entire product in the case of "all-in-one" systems, is disposable and can be discreetly thrown away after use, leaving little to no physical evidence that a cannabis product has been consumed.    Unfilled closed cannabis vaporizer system cartridges are also sold to cannabis oil producers rather than end consumers, whereas open cannabis vaporizers are sold directly to end consumers.

97.    Closed cannabis vaporizer systems are thus a distinct market from open cannabis vaporizer systems, both of which are eventually sold to cannabis consumers. Unfilled closed cannabis vaporizer systems, however, are sold initially to a cannabis oil producer which then adds the cannabis oil to the closed vaporizer system. Closed cannabis vaporizer systems and cannabis oil are then sold to retail consumers together.

98.    Smoore's Complaint contains a description and diagrams of closed cannabis vaporizer systems. Complaint ¶¶ 20-21. As Smoore describes, closed cannabis vaporizer systems consist of a battery and an atomizer/cartridge assembly, with the atomizer/cartridge assembly including a mouthpiece and a reservoir which is filled with cannabis oil by a cannabis oil producer. Below is a diagram of a closed cannabis oil vaporizer system from Smoore's Complaint. The top image shows a Closed Cannabis Vaporizer System including an atomizer/cartridge assembly and battery. The bottom image shows an atomizer/cartridge assembly, which consists of

a mouthpiece, liquid reservoir, and atomizer core assembly.



Drawing 1: illustration of atomizer (a/k/a atomizer assembly, cartridge, cartridge assembly) and vaping device (a/k/a vaporizer or vaping assembly)



Drawing 2: illustration of mouthpiece (a/k/a mouthpiece assembly), liquid reservoir, atomizer coil assembly and atomizer (a/k/a atomizer assembly, cartridge, or cartridge assembly)

99.    The market for Closed Cannabis Vaporizer Systems and Components includes all-in-one systems, in which the entire system is sold together (atomizer/cartridge assembly and battery), and systems in which individual components, such as additional cartridges and batteries, may be sold separately.

100.    The most common form of closed cannabis vaporizer system is a 510 threaded cartridge, which has accounted for 85-90% of closed cannabis vaporizer system sales in recent years, though the popularity of the 510 threaded cartridge

format has recently been decreasing. Other common forms of closed cannabis vaporizer systems include other forms of filled cartridges, filled pods, and disposable all-in-one devices.

101.   The average wholesale sales price of an empty closed cannabis vaporizer system cartridge (i.e., the sale of an empty cartridge to a cannabis oil producer) is between $0.80 and $2.00.

102.   While cannabis markets in the United States are limited to individual states, the market for closed cannabis vaporizer systems and components is nationwide.

103.   Smoore, including CCELL, controls at least 50%-60% of the market for closed cannabis vaporizer systems and components.   Over the last five years Smoore's market share has varied from a high of over approximately 80% to between 50-60%. Smoore's Complaint admits that it participates in the market for closed cannabis vaporizer systems and components, as Smoore alleges that any manufacturer selling such systems or components in a 'not-yet-assembled' form (mouthpiece, reservoir, and atomizer assembly), would infringe upon Smoore's design patents. Complaint ¶¶ 51, 59. Likewise, Smoore recognized in its annual reports that it possessed a 'leading position' in the market for closed cannabis vaporizer systems and components.[18]

104.   Because of, inter alia, the differences between different cannabis consumption methods, closed cannabis vaporizer systems are highly specialized products utilized by a core group of sophisticated cannabis producers and consumers whose preferences are strong enough to constitute an independent antitrust market.

105.   As such, closed cannabis vaporizer systems do not exhibit strong, positive cross-elasticity of demand with respect to the price of other cannabis

---

[18]   See Smoore Holdings 2022 Annual Report at 17 ("For vaping products for special purpose, we have improved the product matrix and will strengthen the sales system by means of channel penetration, etc, and are confident in further strengthening the leading market position in such field.").

1  consumption, or even other cannabis vaporizer, products. Thus, if a hypothetical

2  monopolist were to impose a small but significant nontransitory increase in the price

3  of closed cannabis oil vaporizer products, cannabis oil producers and consumers

4  could not switch to alternative products and thereby render the price unprofitable,

5  because no other product would result in a cannabis consumption product with the

6  required characteristics discussed above.

7  **Supply-Side Substitution is Unlikely Because of High Entry Barriers**

8  106.   The development and manufacture of closed cannabis oil vaporizer

9  systems requires a lengthy research and development process, expensive and

10  particular facilities and equipment, and exhaustive testing in bench samples and at

11  scale. In particular, the production of closed cannabis oil vaporizer systems requires

12  suitable manufacturing plants with appropriate equipment and advanced laboratories

13  with specific equipment, including costly and unconventional machines and devices.

14  107.   In case of price increases, other potential vaporizer system

15  manufacturers would be unable to respond by promptly altering their production

16  processes to enter into the market in order to render the price increase unprofitable,

17  especially because the development process is lengthy, costly and responds to

18  specific technical requirements of cannabis oil producers.

19  108.   There are substantial barriers to market entry in the closed cannabis oil

20  vaporizer system market, including Smoore's scheme to attempt to enforce invalid

21  patents and Smoore's unreasonably anticompetitive distribution agreements and

22  horizontal price controls.  Smoore's attempt to bar competitors from the market by

23  bringing its since-rejected claim before the ITC successfully drove several

24  competitors from the market and imposed significant additional costs on the

25  competitors that did manage to retain a position in the market.  At least three

26  respondents in the ITC proceeding appear to have gone out of business entirely

27  during the ITC proceeding.

28  109.   As a result of the above, supply-side substitution is unlikely, and as

such, the possibility of supply-side substitution does not meaningfully constrain prices in the market for closed cannabis oil vaporizer systems.

### Relevant Geographic Market

110.   The relevant geographic market for closed cannabis oil vaporizer systems is the United States. Cannabis is currently legal for recreational use in 24 states, and for medical use in an additional 14 states. While each state's cannabis market is localized to within the borders of that state, the market for closed cannabis oil vaporizer systems is nationwide, as closed cannabis oil vaporizer systems not containing cannabis, such as products provided by Smoore and NLV, can be shipped nationwide.

111.   Cannabis oil producers and consumers can only access cannabis vaporizer systems available in the United States and allowed to be purchased, sold and utilized in the United States. Further, cannabis oil producers utilize the United States to produce their cannabis oil to be sold in the various states of the United States. The closed cannabis oil vaporizer system market thus operates on a nationwide basis. Much of the sales activity in the market occurs through nationwide channels.

112.   To compete effectively within the United States, distributors and manufacturers of closed cannabis oil vaporizer systems need distribution assets and relationships within the United States. Manufacturers and distributors who lack such assets and relationships are unable to constrain the prices of closed cannabis oil vaporizer systems of manufacturers and sellers who have such domestic assets and relationships. Therefore, the relevant geographic market is the United States. This is dictated in large part by the fact that, as alleged above, Smoore's invalid patents work as entry barriers, by preventing and excluding the importation of any goods into the United States that could compete in the closed cannabis oil vaporizer system market.

### Monopoly Power

113.   Smoore had and has monopoly power in the closed cannabis oil

vaporizer systems and components market in the United States, defined above, which allows Smoore to unilaterally control prices and exclude competitors, by means other than competition on the merits. Further, through the anticompetitive conduct alleged herein, Smoore leveraged its monopoly power in the closed cannabis oil vaporizer system market to exclude and further monopolize the market for closed cannabis oil vaporizer systems by utilizing sham litigation and coercive distribution agreements and unreasonable horizontal and vertical pricing and sales agreements.

114. Because of Smoore's exclusionary scheme, including its attempted enforcement of its invalid patents, Smoore has been able to forestall competition in the closed cannabis oil vaporizer systems market, making it unlikely that any other entrant could have gained a meaningful market share at the time of the violations alleged herein.

115. Further, as detailed above, in the closed cannabis oil vaporizer systems market, there are substantial barriers to market entry and to competitors' ability to increase their output in the short run, including Smoore's exclusionary scheme.

116. In addition, the development of closed cannabis oil vaporizer systems is a lengthy, costly, and uncertain process. As such, developing potential market alternatives would require exhaustive testing, substantial technical know-how, research and development capabilities, and significant capital investment.

117. Thus, potential market entrants face a substantial competitive disadvantage with regard to the largest established supplier of closed cannabis oil vaporizer systems, Smoore.

118. Finally, Smoore's actions described above are direct evidence of Smoore's monopoly power. In particular, Smoore had the power to unilaterally increase prices substantially and utilize that power to exclude competition in the market for closed cannabis oil vaporizer systems through its dealings with distributors.

119. Smoore's monopoly power and motivation to forestall competition is

#:949

also reflected in its financial results. In 2021, Smoore's reported revenues rose approximately 37.4% over the previous year as gross profit margin increased slightly from 52.9% to 53.6%.[19] [20]   In 2022, Smoore's total revenue declined as its gross profit margin dropped sharply, to 43.4%.[21]   In 2023, Smoore issued a warning to investors that net profit for the first 6 months of the year would be starkly lower than the previous year as revenues had declined again. [22]

## NLV'S U.S. PATENT NO. 11,744,294

120.   NLV owns by assignment U.S. Patent No. 11,744,294 (the "'294 Patent"), entitled "Cartridge Packaging Systems and Methods". The U.S. Patent and Trademark Office ("USPTO") lawfully and duly issued the '294 Patent on September 5, 2023. A true and correct copy of the '294 Patent is attached hereto as Exhibit 1.

121.   NLV asserts Smoore's accused products infringe at least independent claims 1, 10, 18, and 19 of the '294 Patent literally and/or under the doctrine of equivalents.

## SMOORE'S ACCUSED PRODUCTS

122.   Smoore offers and continues to offer for sale cartridge packaging and capping systems for filling and capping oil-vaping cartridges.   The cartridge packaging includes a first tray made of deformable material (such as foam) with voids for holding cartridge bodies; cartridge bodies; a cover that covers the first tray; a second tray made of deformable material with voids for holding mouthpieces; and mouthpieces.  Each capping system further includes a jig.

123.   Smoore's Accused Products include: packaging of "CCELL Snap-Fit" cartridges and mouthpieces; packaging of "CCELL Press-Fit" cartridges and mouthpieces; packaging of "CCELL All-In-One" devices and mouthpieces; "CCELL

---

[19]    https://tobaccoreporter.com/2022/04/08/smoore-revenue-jumps-nearly-40-percent/ (last accessed June 5, 2024).
[20]    Smoore Holdings 2022 Annual Report. Smoore does not break down revenue figures by product line.
[21]    Smoore Holdings 2022 Annual Report.
[22]    https://tobaccoreporter.com/2023/07/20/smoore-issues-profit-warning/   (last accessed June 5, 2024).

39

Snap-Fit Capping Press", "CCELL Press-Fit Capping Press", and "CCELL All-In-One Capping Press," as demonstrated in the exemplary infringement claim chart attached hereto as Exhibit 3.  The Accused Products are sold and/or offered for sale in this District by or on behalf of Smoore.

124.    On information and belief, Smoore prepared videos of its packaging and capping systems that copied certain visual and language presentation aspects of NLV's capping system video.  Smoore also hired a NLV employee who then made the CCELL marketing videos promoting Smoore's packaging and capping systems.[23]

## COUNT I
### (Declaratory Judgment of Noninfringement of the '762 Patent)

125.    NLV incorporates by reference the allegations contained in all preceding paragraphs of these counterclaims.

126.    Smoore contends that it owns the '762 Patent, and that NLV infringes at least claims 1, 2, and 7 of the '762 Patent by making, testing, using, offering for sale, selling and/or importing into the United States NLV's Accused Products.

127.    An actual and justiciable controversy between Smoore and NLV exists regarding whether NLV has infringed any claims of the '762 Patent by making, testing, using, offering for sale, selling and/or importing into the United States NLV's Accused Products, and this controversy is ripe for adjudication by this Court.

128.    NLV's products, including its Accused Products, do not infringe any claims of the '762 Patent, either literally or under the doctrine of equivalents, at least because there is no "heating element embedded in an interior of the liquid absorption element", no "heating element…wherein an edge of the heating element is internally tangent to the atomizing surface", and no "power source assembly…configured to provide power for the heating element", as required by independent claim 1.  This is

---

[23]    *See* CCELL Press-Fit https://www.youtube.com/watch?v=zjxoTjOz84k; CCELL Snap Fit https://www.youtube.com/watch?v=Fd8vFz_XJ6s; CCELL All in One https://www.youtube.com/watch?v=Dm7FqO-_nkU.

1    supported by the CALJ's findings in the ITC Investigation. *See* Exhibit 2 at 65, 68,
2    70-72.

3    129.   While Smoore argued that the Accused Products each included wires
4    and a threaded connection for connecting to a battery, the CALJ noted that "wires
5    and a threaded connection do not by themselves satisfy the power source assembly
6    limitation", and found that "Smoore has failed to show a battery or any other power
7    source assembly in any [] Accused Product." *Id*. at 71. Smoore admits as much in its
8    own Complaint filed with this Court, that NLV's Accused Products do not include a
9    battery, by pleading that the NLV's oil-vaping cartridges must "then further [be]
10   assembled with a battery or other power source to form vaping devices." *See* Dkt. 1
11   at ¶ 20. As mentioned above, the same NLV products were accused in both the ITC
12   Investigation and this instant District Court Action.

13   130.   The remaining asserted claims—2 and 7—each depend from claim 1.
14   As the CALJ found that the Accused Products, including NLV's Accused Products,
15   do not infringe claim 1, the Accused Products do not infringe claims 2 and 7. *Id*. at
16   72.

17   131.   To this end, and pursuant to the Federal Declaratory Judgment Act, 28
18   U.S.C. §§ 2201 *et seq.*, NLV requests a judicial determination that making, testing,
19   using, offering for sale, selling, and/or importing into the United States NLV's
20   Accused Products do not infringe any valid and enforceable claim of the '762 Patent.

21
22              **<u>COUNT II</u>**
       **(Declaratory Judgment of Noninfringement of the '763 Patent)**

23
24   132.   NLV incorporates by reference the allegations contained in all
     preceding paragraphs of these counterclaims.

25
26   133.   Smoore contends that it owns the '763 Patent, and that NLV infringes
27   at least claims 1 and 11 of the '763 Patent by making, testing, using, offering for sale,
     selling and/or importing into the United States NLV's Accused Products.
28

134.   An actual and justiciable controversy between Smoore and NLV exists regarding whether NLV has infringed any claims of the '763 Patent by making, testing, using, offering for sale, selling and/or importing into the United States NLV's Accused Products, and this controversy is ripe for adjudication by this Court.

135.   NLV's products, including its Accused Products, do not infringe any claims of the '763 Patent, either literally or under the doctrine of equivalents, at least because none of NLV's Accused Products include a "mouthpiece assembly", and so cannot satisfy this limitation in claim 1 ("[a]n atomizer applicable in an electronic cigarette, comprising…a mouthpiece assembly") or claim 11 ("An electronic cigarette comprising an atomizer, the atomizer comprising… a mouthpiece assembly"). Even Smoore admits as much in its own Complaint filed with this Court, by pleading that NLV's Accused "oil-vaping cartridges" must "be assembled together with mouthpieces to make atomizers". *See* Dkt. 1 at ¶ 20.

136.   Furthermore, Smoore has failed to show that any of the NLV C2, C3, C4, or GoodCarts C2 cartridges include "a discharging hole for discharging air inside the liquid reservoir."

137.   To this end, and pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, NLV requests a judicial determination that making, testing, using, offering for sale, selling, and/or importing into the United States NLV's Accused Products do not infringe any valid and enforceable claim of the '763 Patent.

## COUNT III
### (Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1)

138.   NLV hereby repeats and incorporates by reference each proceeding and succeeding paragraph as though fully set forth herein.

139.   Beginning some time before but no later than January 1, 2019, the exact date being unknown to NLV and exclusively within the knowledge of Smoore (the "Conspiracy Period"), Smoore entered into a continuing combination or conspiracy to unreasonably restrain trade and commerce in in violation of Section 1 of the

Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition for the pricing of closed cannabis oil vaporizer system products directly sold to United States purchasers.

140.   In particular, Smoore's unreasonably restrictive distribution agreements constitute agreements in restraint of trade that were entered into for the purpose of combining and conspiring to raise, fix, maintain, or stabilize the prices of closed cannabis oil vaporizer system products sold to purchasers in the United States during the Conspiracy Period.

141.   As a result of Smoore's and its Co-Conspirators' unlawful conduct and acts taken in furtherance of the conspiracy, prices for closed cannabis oil vaporizer system products sold to purchasers in the United States were raised, fixed, maintained, or stabilized at artificially inflated levels.

142.   The combination or conspiracy among Smoore and its Co-Conspirators consisted of a continuing agreement, understanding, and concerted action among Smoore and its Co-Conspirators.

143.   For purposes of formulating and effectuating their combination or conspiracy, Smoore and its Co-Conspirators did those things they combined or conspired to do, including: agreeing to the anticompetitive distribution agreements, policing the agreements through continuous monitoring of the conspiracy and bilateral communications with distributors, and punishing competitive behavior by any distributor attempting to act in a competitive manner.

144.   As a result of Smoore's anticompetitive and unlawful conduct, NLV has been injured in its business and property in that it has been foreclosed from certain distribution methods, and has incurred higher costs to manufacture and distribute closed cannabis oil vaporizer system products than it otherwise would have incurred in the absence of Smoore's conduct.

145.   NLV has suffered antitrust injury and damages as a direct result of Smoore's unlawful conduct. NLV's antitrust injury include the higher costs NLV has

incurred to manufacture and distribute closed cannabis oil vaporizer system products than it otherwise would have incurred in the absence of Smoore's conduct. NLV's antitrust injury entitles it to bring this count under Section 4 of the Clayton Act, 15 U.S.C. § 15, and entitles NLV to recover three times its damages, costs, and reasonable attorney's fees.

## COUNT IV
### (Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2)

146.   NLV hereby repeats and incorporates by reference each proceeding and succeeding paragraph as though fully set forth herein.  The foregoing distribution agreements constitute a series of contracts and/or combinations dictated to Smoore's distributors by Smoore to unlawfully restrain trade by monopolizing the market for closed cannabis oil vaporizer system products in the United States in violation of Section 2 of the Sherman Act.

147.   Smoore's actions to attempt to enforce the '623 Patent by engaging in sham litigation involving additional patents constitute an abuse of the patent system, as the real goal of this litigation is to attempt to enforce the much broader rights under the '623 Patent, which has been found unenforceable.

148.   NLV has been harmed by this anticompetitive scheme because Smoore, the much-larger competitor to NLV, has brought suit against NLV in an attempt to force NLV out of the market for closed cannabis oil vaporizer system products through sheer market power due to its unlawful monopolization efforts.

149.   Competition for closed cannabis oil vaporizer system products, including price competition, has been and will continue to be restrained, suppressed, or eliminated as a result of the anticompetitive conduct described herein.

150.   Competitors, including potential competitors, have been and will continue to be restrained from vigorously competing with one another for selling closed cannabis oil vaporizer system products.

151.   As a direct result of the unlawful actions of Smoore, customers of closed

cannabis oil vaporizer system products have been deprived of choice and have paid significantly more for closed cannabis oil vaporizer system products than they would have in the absence of the unlawful conduct.

152.  NLV has suffered antitrust injury and damages as a direct result of Smoore's unlawful conduct. NLV's antitrust injury include the higher costs NLV has incurred to manufacture and distribute closed cannabis oil vaporizer system products than it otherwise would have incurred in the absence of Smoore's conduct. NLV's antitrust injury entitles it to bring this count under Section 4 of the Clayton Act, 15 U.S.C. § 15, and entitles NLV to recover three times its damages, costs, and reasonable attorney's fees.

## COUNT V
### (Attempted Violations of Section 2 of the Sherman Act, 15 U.S.C. § 2)

153.  NLV hereby repeats and incorporates by reference each proceeding and succeeding paragraph as though fully set forth herein.

154.  As alleged above, Smoore at all times relevant had and continues to have monopoly power in the closed cannabis oil vaporizer system products market, or, at a minimum, a dangerous probability of success in acquiring monopoly power in the closed cannabis oil vaporizer system products market, including the power to control prices and exclude competition.

155.  As alleged above, Smoore has willfully, knowingly, and with specific intent to do so, attempted to monopolize the closed cannabis oil vaporizer system products market.

156.  Smoore's anticompetitive conduct alleged above has been directed at accomplishing the unlawful objective of controlling prices and/or preventing competition in the closed cannabis oil vaporizer system products market. Smoore's ongoing anticompetitive conduct presents a dangerous probability that Smoore will succeed, to the extent it has not already done so, in its attempt to monopolize the closed cannabis oil vaporizer system products market.

157.    Smoore's anticompetitive conduct alleged above does not reasonably accomplish any procompetitive goals, any procompetitive benefits are outweighed by anticompetitive harm, and/or there are less restrictive alternatives by which Smoore would be able to reasonably achieve any procompetitive goals.

158.    NLV has suffered antitrust injury and damages as a direct result of Smoore's unlawful conduct. NLV's antitrust injury include the higher costs NLV has incurred to manufacture and distribute closed cannabis oil vaporizer system products than it otherwise would have incurred in the absence of Smoore's conduct. NLV's antitrust injury entitles it to bring this count under Section 4 of the Clayton Act, 15 U.S.C. § 15, and entitles NLV to recover three times its damages, costs, and reasonable attorney's fees.

## COUNT VI
### (Violation of California Cartwright Act-California Business and Professions Code, §§ 16700, *et seq.*)

159.    NLV hereby repeats and incorporates by reference each proceeding and succeeding paragraph as though fully set forth herein.

160.    During the Conspiracy Period, Smoore and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720, California Business and Professions Code. Smoore has acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of, and allocate markets for, closed cannabis oil vaporizer system products at supra-competitive levels.

161.    The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Smoore and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of, and to allocate markets for, closed cannabis oil vaporizer system products.

162.    For the purpose of forming and effectuating the unlawful trust, Smoore

---

and their co-conspirators have done those things which they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth above and the following: (1) fixing, raising, stabilizing, and pegging the price of closed cannabis oil vaporizer system products; and (2) entering into restrictive distribution agreements that constitute unlawful and/or coercive agreements to fix, raise, stabilize, and maintain resale prices of closed cannabis oil vaporizer system products in violation of California law; and (3) allocating among themselves the customers of closed cannabis oil vaporizer system products.

163. The combination and conspiracy alleged herein has had, inter alia, the following effects: (1) price competition in the sale of closed cannabis oil vaporizer system products has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for closed cannabis oil vaporizer system products sold by Smoore and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) those who purchased closed cannabis oil vaporizer system products have been deprived of the benefit of free and open competition.

164. As a direct and proximate result of Smoore's unlawful conduct, NLV was injured in its business and property in California in that NLV was foreclosed from an important distribution stream and was foreclosed from competing in a competitive market for closed cannabis oil vaporizer system products in California. As a result of Smoore's violation of the Cartwright Act, NLV seeks treble damages and its cost of suit, including a reasonable attorney's fee, pursuant to Section 16750(a) of the California Business and Professions Code.

## COUNT VII
### (Infringement of the '294 Patent)

165. NLV incorporates by reference the allegations contained in all preceding paragraphs of these counterclaims.

166. Upon information and belief, Smoore has been and is still infringing,

contributing to infringement, and/or inducing others to infringe the '294 Patent at least by making, testing, using, offering for sale, importing, and/or selling products that practice the '294 Patent, without authority or license. Smoore's infringing Accused Products include, but are not limited to, at least packages of CCELL Snap-Fit cartridges and mouthpieces; packaging of CCELL Press-Fit cartridges and mouthpieces; packages of CCELL All-In-One devices and mouthpieces; and Capping Presses to affix CCELL cartridges and mouthpieces, as demonstrated in the exemplary infringement claim chart attached hereto as Exhibit 3.

167.    Upon information and belief, Smoore has had knowledge of the '294 Patent at least as of the filing of this counterclaim, if not before, through a former NLV employee that left NLV to join Smoore in November 2023. This employee was hired by NLV in October 2023, and while at NLV received extensive training on NLV's product offerings, and NLV's intellectual property. This included training pertaining specifically to NLV's product covered by the '294 Patent.  On information and belief, this employee had knowledge of NLV's '294 Patent. After receiving such training and knowledge, this employee left NLV to join Smoore in November 2023. Smoore actively, knowingly, and intentionally induces others, including its customers and end users, to infringe one or more claims of the '294 Patent by encouraging and facilitating others to perform actions that Smoore knows to be acts of infringement of the '294 Patent, and with the intent that those performing the acts infringe the '294 Patent, or with willful blindness to such infringement. This is demonstrated by Smoore's instructions, including production and public posting of promotional videos that instruct how to use Smoore's Accused systems and packaging, and were made with the help of this former NLV employee. Smoore's videos on its Accused systems were posted on its YouTube account in May 2024, just 2.5 weeks after NLV posted its promotional videos pertaining to NLV's product covered by the '294 Patent. Notably, this former NLV employee is the featured instructor in each of Smoore's instructional videos promoting Smoore's Accused

1    systems.

2        168.    As a direct and proximate result of Smoore's acts of infringement, NLV

3    has been damaged in an amount not yet determined, including but not limited to lost

4    profits, price erosion, lost convoyed sales, and, in no event, less than a reasonable

5    royalty and/or the additional remedies defined by 35 U.S.C. § 289.

6        169.    NLV has been irreparably harmed by Smoore's infringing activities, and

7    NLV will continue to be irreparably harmed by such activities in the future unless

8    those infringing activities are enjoined by this Court because, among other things,

9    NLV and Smoore directly compete for sales of cartridge capping jig systems.

10   **<u>PRAYER FOR RELIEF</u>**

11   NLV respectfully requests that the Court enter judgment in its favor and against

12   Smoore as follows:

13       A.    Dismissing with prejudice all of Smoore's claims against NLV;

14       B.    Denying all relief that Smoore seeks in its Complaint against NLV;

15       C.    Ruling in favor of NLV on all of NLV's affirmative defenses;

16       D.    Entering judgment in NLV's favor on each cause of action in the

17           counterclaims;

18       E.    Granting an injunction and enjoining Smoore and its officers, agents,

19           servants, employees, attorneys, and all others in active concert and/or

20           participation with Smoore from infringing the '294 Patent through the

21           manufacture, use, test, importation, offer for sale, and/or sale of

22           infringing products;

23       F.    Awarding NLV for compensatory and trebled damages to be proven at

24           trial; including for any infringement and enhanced damages pursuant to

25           35 U.S.C. § 284;

26       G.    Awarding NLV for disgorgement of unjust enrichment;

27       H.    Awarding NLV punitive damages in an amount to be proven at trial;

28       I.    Awarding NLV their expenses and costs in accordance with Rule 54(d)

of the Federal Rules of Civil Procedure;

J.   Awarding NLV attorney's fees including under 35 U.S.C. § 285;

K.   Awarding NLV prejudgment and post-judgment interest; and

L.   Awarding NLV any other relief that the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), NLV demands a trial by jury on all issues so triable.

Dated:  October 3, 2024            Respectfully submitted,

**BRYAN CAVE LEIGHTON PAISNER LLP**

By: */s/ Kristin S. Webb*

Kristin S. Webb
R. Tyler Goodwyn IV
Charles E. Tompkins
*Attorneys for Defendant Next Level Ventures, LLC*