1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28


**BRYAN CAVE LEIGHTON PAISNER LLP**
Kristin S. Webb (Cal. Bar No. 258476)
kristen.webb@bclplaw.com
1920 Main Street, Suite 1000
Irvine, California 92614
Tel: (949) 223-7000
Fax: (949) 223-7100

R. Tyler Goodwyn IV (*Pro Hac Vice*)
Charles E. Tompkins (*Pro Hac Vice*)
tyler.goodwyn@bclplaw.com
charles.tompkins@bclplaw.com
1155 F Street, NW
Washington, D.C. 20004
Tel: (202) 508-6015
Fax: (202) 508-6200

*Attorneys for Defendant/Counterclaim-Plaintiff Next Level Ventures, LLC and Defendant Advanced Vapor Devices LLC*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHENZHEN SMOORE TECHNOLOGY CO. LTD., <br><br> *Plaintiff,* <br><br> v. <br><br> NEXT LEVEL VENTURES, LLC and ADVANCED VAPOR DEVICES LLC, <br><br> *Defendants.* | Case No. 2:22-cv-07646-AB-AGR <br><br> **COUNTERCLAIM-PLAINTIFF NEXT LEVEL VENTURES, LLC'S OPPOSITION TO COUNTERCLAIM-DEFENDANT SHENZHEN SMOORE TECHNOLOGY CO. LTD.'S MOTION TO BIFURCATE AND STAY ANTITRUST COUNTERCLAIMS OR, IN THE ALTERNATIVE, TO DISMISS COUNTERCLAIM-PLAINTIFF'S AMENDED COUNTERCLAIMS AND STRIKE AFFIRMATIVE DEFENSES; MEMORANDUM OF POINTS AND AUTHORITIES** |
| NEXT LEVEL VENTURES, LLC, <br><br> *Counterclaim-Plaintiff,* <br><br> v. <br><br> SHENZHEN SMOORE TECHNOLOGY CO. LTD., <br><br> *Counterclaim-Defendant.* | Date: December 6, 2024 <br> Time: 10 a.m. <br> Courtroom 7B <br><br> Judge: Hon. André Birotte Jr. |

1

# **TABLE OF CONTENTS**

I.     INTRODUCTION AND SUMMARY OF ARGUMENT ................................. 1

II.    THE PRODUCT AND MARKETS AT ISSUE ......................................... 4

III.   BRIEF SUMMARY OF NLV'S ALLEGATIONS ................................... 4

IV.    NLV'S ANTITRUST COUNTERCLAIMS SHOULD NOT BE STAYED
       OR BIFURCATED ........................................................................ 6

       A.    Bifurcation is Unwarranted and Premature. ........................... 6

       B.    NLV's Amended Complaint and Discovery Requests Do Not Justify
             Bifurcation. ........................................................................ 9

       C.    The Prejudice Analysis Favors NLV and Smoore's Jury Confusion
             Arguments Are Premature. .................................................. 10

       D.    Staying NLV's Antitrust Claims Would Not Promote Judicial
             Economy. ........................................................................... 11

V.     SMOORE'S MOTION TO DISMISS NLV'S COUNTERCLAIMS
       SHOULD BE DENIED ................................................................. 11

       A.    Applicable Legal Standards. ............................................... 11

       B.    The *Noerr-Pennington* Doctrine Does Not Insulate Smoore from
             Liability. ........................................................................... 12

             1.    NLV Has Sufficiently Pleaded a *Walker Process* Claim. ......... 13

             2.    NLV's Claims Satisfy the Sham Litigation Exception. ............ 14

             3.    There Is No Requirement that a Sham Litigation Claim Arise
                   from Pending Litigation. .............................................. 14

             4.    Smoore's Effort to Enforce a Fraudulently Obtained Patent is
                   Part of a Larger Scheme that is not Insulated by *Noerr-
                   Pennington*. ............................................................... 15

       C.    NLV Alleges a Viable Market. ............................................ 16

       D.    NLV's Allegations of Anticompetitive Contracts Between Smoore and
             Its Distributors State a Section I Claim. .............................. 18

       E.    NLV Has Plausibly Pleaded Substantial Market Foreclosure. ........... 19

       F.    Smoore's Declining Market Share Does Not Insulate It from Liability.
             ....................................................................................... 20

i

NEXT LEVEL VENTURES'S OPPOSITION TO SHENZHEN SMOORE'S MOTION TO BIFURCATE AND STAY ANTITRUST
COUNTERCLAIMS, OR DISMISS AMENDED COUNTERCLAIMS AND STRIKE AFFIRMATIVE DEFENSES

G.     NLV's California Cartwright Act Counterclaim Is Sufficiently Pleaded. ...................................................................................21

H.     NLV's Induced Infringement Counterclaim Is Sufficiently Pleaded. .21

VI.     NLV'S AFFIRMATIVE DEFENSES ARE PROPERLY PLEADED ........... 22

A.     NLV's Affirmative Defenses of Noninfringement (1st), No Willful Infringement (7th), Statutory Limitation on Damages (5th), and No Exceptional Case (8th) Are Proper. .......................................................22

B.     NLV Sufficiently Pleads its Invalidity (2nd), Equitable (4th), Ensnarement (9th), Prosecution History Estoppel (3rd), and License, Patent Exhaustion (6th) Affirmative Defenses. ....................................23

VII.     CONCLUSION ................................................................................. 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aurora World, Inc. v. Ty, Inc.*,
   2011 WL 13185687 (C.D. Cal. Mar. 14, 2011) ................................................ 7

*Avocent Huntsville, LLC v. ZPE Sys., Inc.*,
   2018 WL 1411100 (N.D. Cal. Mar. 21, 2018) ................................................ 22

*Bal Seal Eng'g, Inc. v. Nelson Prod., Inc.*,
   2016 WL 11495986 (C.D. Cal. Dec. 7, 2016) ............................. 13, 14, 15, 16

*Baroness Small Estates, Inc v. BJ's Rests., Inc.*,
   2011 WL 3438873 (C.D. Cal. Aug. 5, 2011) ................................................ 23

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ........................................................................................ 12

*Brown Shoe v. United States*,
   370 U.S. 294 (1962) .................................................................................. 16, 18

*Cellular Plus, Inc. v. Superior Court of San Diego Cnty.*,
   14 Cal.App.4th 1224 (1993) ........................................................................... 21

*Consumerinfo.com, Inc. v. Chang*,
   2009 WL 10673208 (C.D. Cal. Nov. 12, 2009) ............................................. 14

*Conwood Co. v. U.S. Tobacco Co.*,
   290 F.3d 768 (6th Cir. 2002) ......................................................................... 21

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
   370 U.S. 690 (1962) ........................................................................................ 12

*Cranial Techs., Inc. v. Ottobock SE & Co. KGaA*,
   2023 WL 8115126 (C.D. Cal. Nov. 2, 2023) ................................................ 22

*Dairy, LLC v. Milk Moovement, Inc.*,
   2022 WL 4387981 (E.D. Cal. Sept. 22, 2022) .............................................. 16

*Dentsply Int'l, Inc. v. New Tech. Co.*,
   1996 WL 756766 (D. Del. Dec 19, 1996) .................................................. 7, 11

*Dodocase VR, Inc. v. MerchSource*,
   LLC, 2020 WL 363040 (N.D. Cal. Jan. 22, 2020) ........................................ 23

iii

NEXT LEVEL VENTURES'S OPPOSITION TO SHENZHEN SMOORE'S MOTION TO BIFURCATE AND STAY ANTITRUST
COUNTERCLAIMS, OR DISMISS AMENDED COUNTERCLAIMS AND STRIKE AFFIRMATIVE DEFENSES

*Don Copeland v. Energizer Holdings, Inc.*,
  716 F. Supp. 3d 749 (N.D. Cal. 2024) ................................................................. 19

*Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*,
  111 F.4th 337 (4th Cir. 2024) ................................................................. 12, 19

*Eastern R. R. Presidents Conf. v. Noerr Motor Freight, Inc.*,
  365 U.S. 127 (1961) ................................................................. 12

*Ecological Rts. Found. v. Hot Line Constr., Inc.*,
  2021 WL 1537205 (C.D. Cal. Feb. 17, 2021) (Birotte, J.) ........................ 22, 23

*Edwards Vacuum, LLC v. Hoffman Instrumentation Supply Inc*,
  556 F. Supp. 3d 1156 (D. Or. 2021) ................................................................. 8

*Empress LLC v. City & Cnty. of San Francisco*,
  419 F.3d 1052 (9th Cir. 2005) ................................................................. 13

*Federal Trade Commission v. Qualcomm, Inc.*,
  411 F. Supp. 3d 658 (N.D. Cal. 2019) ................................................................. 18

*Federal Trade Commission v. Qualcomm, Inc.*,
  969 F.3d 974 (9th Cir. 2020) ................................................................. 18

*Feitelson v. Google Inc.*,
  80 F.Supp.3d 1019 (N.D. Cal. 2015) ................................................................. 20

*Fitbit, Inc. v. Aliphcom*,
  2016 WL 7888033 (N.D. Cal. May 27, 2016) ...................................................... 7

*High Technology Careers v. San Jose Mercury News*,
  996 F.2d 987 (9th Cir. 1993) ................................................................. 17

*Hydranautics v. FilmTec Corp.*,
  70 F.3d. 533 (9th Cir. 1995) ................................................................. *passim*

*Juno Therapeutics, Inc. v. Kite Pharma*,
  2018 WL 1470594 (C.D. Cal. Mar. 8, 2018) ...................................................... 22

*Kottle v. Nw. Kidney Centers*,
  146 F.3d 1056 (9th Cir. 1998) ................................................................. 13

*Loctite Corp. v. Ultraseal Ltd.*,
  781 F.2d 861 (Fed. Cir. 1985) ................................................................. 16

*MACOM Tech. Sols. Holdings, Inc. v. Infineon Techs. AG*,
  2017 WL 3298670 (C.D. Cal. Aug. 2, 2017) ...................................................... 22

*McWane, Inc. v. F.T.C.*,
  783 F.3d 814 (11th Cir. 2015) ................................................................. 19, 21

iv

*Michael Kors, L.L.C. v. Chunma U.S.A., Inc., et al.*,
   2017 WL 5665003 (C.D. Cal. Aug 30, 2017) (Birotte, J.)..............................6, 7

*Moyo v. Gomez*,
   32 F.3d 1382 (9th Cir. 1994) ...............................................................................12

*Multimedia Pat. Tr. v. DirecTV, Inc.*,
   2011 WL 13100718 (S.D. Cal. Feb. 24, 2011) ....................................................24

*Netflix, Inc. v. Blockbuster, Inc.*,
   2006 WL 2458717 (N.D. Cal Aug 22, 2006)...................................................6, 10

*Newcal Indus., Inc. v. Ikon Off. Sol.*,
   513 F.3d 1038 (9th Cir. 2008) ..............................................................................17

*Nobelpharma AB v. Implant Innovations, Inc.*,
   141 F.3d 1059 (Fed. Cir. 1998) .....................................................................13, 14

*Oahu Gas Serv., Inc. v. Pac. Res., Inc.*,
   838 F.2d 360, 366 (9th Cir. 1988) .......................................................................21

*Omega Envtl. v. Gilbarco, Inc.*,
   127 F.3d 1157 (9th Cir. 1997) ..............................................................................21

*In re Pandora Media, LLC*,
   2022 WL 19299126 (C.D. Cal. Oct. 26, 2022) ....................................................15

*Procter & Gamble Co. v. CAO Group, Inc.*,
   2013 WL 6061103 (N.D. Ohio. Nov. 18, 2013) ...................................................10

*Rebel Oil Co. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995)................................................................................21

*Relevant Grp. LLC v. Nourmand*,
   2022 WL 2189535 (C.D. Cal. Mar. 4, 2022) .......................................................13

*Ritz Camera & Image, LLC v. SanDisk Corp.*,
   772 F. Supp. 2d 1100 (N.D. Cal. 2011), *aff'd*, 700 F.3d 503 (Fed.
   Cir. 2012)..............................................................................................................16

*Rosen v. Masterpiece Mktg. Grp., LLC*,
   222 F. Supp. 3d 793 (C.D. Cal. 2016)..................................................................24

*Safeway Inc. v. Abbott Lab'ys*,
   761 F. Supp. 2d 874 (N.D. Cal. 2011)..................................................................21

*Solyndra Residual Tr. by & through Neilson v. Suntech Power
   Holdings Co.*,
   62 F. Supp. 3d 1027 (N.D. Cal. 2014)..................................................................21

*Teirstein v. AGA Med. Corp.*,
    2009 WL 704138 (E.D. Tex. Mar. 16, 2009) ........................................................ 24

*U.S. v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ................................................................................ 20

*United States v. Google LLC*,
    2024 WL 3647498 (D.D.C. Aug. 5, 2024) .......................................................... 20

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966) .............................................................................................. 12

*Vestem, Inc. v. Regen Labs LLC*,
    No. 2:24-cv-02475-AB-PDx, ECF No. 59 (C.D. Cal. Oct. 10, 2024)
    (Birotte, J.) ...................................................................................................... 23, 24

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*,
    382 U.S. 172 (1965) ....................................................................................*passim*

*In re Washington Mut., Inc. Sec., Derivative & ERISA Litig.*,
    2011 WL 1158387 (W.D. Wash. Mar. 25, 2011) ................................................ 23

*Wonderful Real Est. Dev. LLC v. Laborers Int'l Union of N. Am.*,
    2020 WL 91998 (E.D. Cal. Jan. 8, 2020) ............................................................ 16

*Zenith Elecs., LLC, et al. v. Sceptre, Inc.*,
    2015 WL 12830689 (C.D. Cal. Feb. 5, 2015) ....................................................... 7

**Statutes**

35 U.S.C. § 282(b)(1) ................................................................................................. 22

Sherman Act ............................................................................................ 3, 12, 19, 21

California Cartwright Act ........................................................................................... 21

**Court Rules**

L.R. 16-15 ................................................................................................................... 10

Rule 12(b)(6)......................................................................................................... 11, 17

Rule 26(f) ...................................................................................................................... 9

Rule 42(b) ...................................................................................................................... 6

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

Neither bifurcation nor dismissal of NLV's antitrust counterclaims ("NLV's claims") is warranted. Bifurcating NLV's claims would require this Court to oversee two trials involving overlapping facts and duplicative evidence. Staying NLV's claims would double the length of this overall litigation and embroil this Court in predictable disputes over the relevance of particular discovery to each claim. And dismissal is inappropriate because NLV amply alleges that Smoore unreasonably restrained trade and that the *Noerr-Pennington* doctrine does not apply.

Smoore concedes that the authority in favor of bifurcation arose in situations where "if the plaintiff wins the patent infringement suit, then the antitrust counterclaim may ordinarily be disposed of expeditiously on motion, instead of by a time consuming and expensive trial." *See* ECF No. 80, Smoore's Mot. ("Mot.") at 6 (citation omitted). That is not the circumstance here.

Smoore alleges that NLV has infringed two patents and three design patents. NLV alleges that Smoore unlawfully restrained trade by, *inter alia*: submitting a fraudulent patent application; pursuing baseless litigation for competitive advantage; and imposing unreasonably exclusionary agreements on its distributors for Closed Cannabis Oil Vaporizer Systems and Components that excluded NLV and others from most of relevant market. *See* ECF No. 64, NLV's Am. Answer & Countercl. ("AA&C"). Although the parties' claims involve common evidence, Smoore's infringement action would not, even if successful, dispose of or even substantially narrow NLV's claims.

Were the claims bifurcated, key witnesses on both sides would be required to testify at two separate trials. Certain Smoore employees would testify about both the substantive aspects of Smoore's patent claims and Smoore's business strategy as it relates to NLV's counterclaims in both trials. Similarly, NLV's principal and other senior employees would be called twice to testify regarding NLV's product development and sales strategy and the real-world market foreclosure Smoore's

conduct inflicted. At least one third party distributor, and likely others, would also be required to testify twice, as would experts from both sides.

Staying NLV's claims would only worsen the inefficiency. Two separate juries would need to be impaneled, which would both waste judicial resources and create the risk of conflicting findings of fact. Trial of NLV's claims would necessarily take place well after the trial of Smoore's infringement action to permit time for antitrust discovery. NLV's case would suffer the prejudice common to protracted litigation: fading memories, fewer available witnesses, lost evidence, and the significant additional litigation expense associated with two separate discovery periods. From Smoore's perspective, that is a feature of bifurcation, not a bug. But there is no reason this Court should indulge Smoore's request.

Smoore's arguments in favor of dismissal are no more persuasive. Smoore first asserts that NLV's proposed market definition is too broad because NLV should not have included the words "and its components." The argument both misconceives the interchangeability requirement and raises a factual dispute about the nature of the market that this Court would be unwise to resolve without the benefit of discovery.

Smoore next argues that the *Noerr-Pennington* doctrine insulates Smoore's patent enforcement efforts from antitrust liability. This argument: (1) ignores the *Walker Process* exception to *Noerr-Pennington*; (2) misstates the legal requirements of the sham litigation exception; and (3) mischaracterizes the ITC Administrative Law Judge's ("ITC ALJ's") rulings against Smoore.

The ITC ALJ concluded that Smoore's patent prosecutor "Mr. Cheng ***knowingly submitted a false declaration*** about the reason the '553 application [leading to the '623 patent] was abandoned" and "that the declaration submitted by Mr. Cheng was material to the subsequent issuance of patents maturing from the '553 application, which includes the '623 patent asserted in this investigation." AA&C, Ex. 2 at 93 (emphasis added). NLV amply pleaded a *Walker Process* claim by alleging that Smoore maintained its monopoly, in part, by seeking to enforce the '623

2

NEXT LEVEL VENTURES'S OPPOSITION TO SHENZHEN SMOORE'S MOTION TO BIFURCATE AND STAY ANTITRUST COUNTERCLAIMS, OR DISMISS AMENDED COUNTERCLAIMS AND STRIKE AFFIRMATIVE DEFENSES

1  patent before the ITC. *See Hydranautics v. FilmTec Corp.*, 70 F.3d. 533, 538-9 (9th

2  Cir. 1995).

3      NLV has also pleaded a "sham litigation" claim. Smoore asserts—without

4  citation—that the sham litigation exception only applies where "the **current lawsuit**

5  is objectively meritless, as required." Mot. at 18 (emphasis in original). Smoore is

6  wrong: the Ninth Circuit specifically held that a plaintiff may rely on the sham

7  litigation exception to bring an antitrust claim arising from the defendant's prior

8  prosecution of a fraudulently obtained patent. *See Hydranautics,* 70 F.3d at 534-539.

9  It is difficult to explain why Smoore quoted *Hydranautics* on page 6 of its Motion

10  but later failed to acknowledge that the case forecloses Smoore's sham litigation

11  argument. *See* Mot. at 18.

12      Smoore's remaining arguments are a scattershot effort to suggest that NLV's

13  claims must be dismissed unless every act Smoore undertook in furtherance of its

14  anticompetitive scheme would, considered in isolation, state an antitrust claim. That

15  is not how antitrust cases are analyzed. Rather, the Court must consider whether

16  NLV's allegations, taken as a whole, adequately pleaded a Sherman Act case.

17      For example, Smoore argues that NLV's Section I & II claims arising from

18  Smoore's distribution agreements fail because NLV has not alleged substantial

19  market foreclosure. *See* Mot. at 12-15. That is incorrect: NLV's allegation that

20  Smoore's conduct foreclosed approximately 80% of the market is more than

21  sufficient at this stage to state a claim. And in any event the question is not whether

22  Smoore's exclusive dealing agreements would be unlawful standing alone. The issue

23  is whether those agreements—in concert with Smoore's abusive patent enforcement

24  efforts, horizontal restraints on competition, vertical restraints on pricing, and other

25  anticompetitive activity—unreasonably restrained trade. NLV has more than

26  adequately alleged that they did.

27

28

3

NEXT LEVEL VENTURES'S OPPOSITION TO SHENZHEN SMOORE'S MOTION TO BIFURCATE AND STAY ANTITRUST COUNTERCLAIMS, OR DISMISS AMENDED COUNTERCLAIMS AND STRIKE AFFIRMATIVE DEFENSES

## II.    THE PRODUCT AND MARKETS AT ISSUE

Cannabis can be smoked, ingested in various edible forms, or inhaled using "closed" or "open" vaporizers.[1] AA&C ¶¶ 90-91. Just as there are separate markets for wine, beer and spirits, there are separate markets for different cannabis consumption mechanisms based on the different characteristics of the products. This case involves Closed Cannabis Oil Vaporizer Systems and Components ("closed systems"), which are cannabis delivery products usually consisting of a mouthpiece, reservoir, and atomizer assembly. *See id.* ¶ 98; *see* ECF No. 1 ("Compl.") ¶ 20 (describing and diagramming closed systems). Closed systems rely on an atomizer to vaporize cannabis oil contained in the reservoir. AA&C ¶¶ 98-100. Closed systems are generally sold empty to cannabis oil producers, who then add cannabis oil to the cannabis reservoir and sell the systems to consumers through various retail channels. *Id.* ¶ 97. Closed systems come in many forms, including cartridges, pods, and "all-in-one" systems. *Id.* ¶ 96. Although Smoore quibbles with the words "and components" in the proposed market, Smoore does not dispute any other aspect of NLV's market allegations, set forth in detail in the AA&C. *See Id.* ¶¶ 88-105.

## III.    BRIEF SUMMARY OF NLV'S ALLEGATIONS

In 2018, Smoore, one of the world's largest manufacturers of nicotine vaporizers, controlled 80% of the closed systems market. AA&C ¶¶ 25-31. However, as customers began to demand higher-quality closed systems tailored specifically for cannabis oils, Smoore began losing market share to new competitors who offered products made for use with cannabis, including NLV. *Id.* ¶¶ 32-34.

Faced with this decline, Smoore undertook a plan to suppress and eliminate competition through two complementary courses of conduct: (1) abusing the legal systems of both China and the United States to impose significant costs on smaller

---

[1] Closed systems vaporize cannabis oil contained in a pre-filled cartridge; open cannabis vaporizer systems vaporize separately purchased dried cannabis plant material or solid cannabis concentrates. AA&C ¶¶ 94-96. Smoore does not challenge NLV's allegation that the markets for closed and open systems are distinct.

4

competitors and drive them from the market; and (2) using Smoore's early market power to exclude smaller competitors by enforcing abusive and exclusionary distribution agreements. *Id.* ¶¶ 36-37. Smoore's anticompetitive distribution agreements successfully foreclosed NLV from approximately 80% of the relevant market for several years. *Id.* ¶ 78. Smoore's abusive patent litigation drove several nascent competitors from the market and hobbled other competitors, like NLV, with litigation expenses and market uncertainty that significantly retarded their ability to grow and compete. *Id.* ¶¶ 35, 51. Although Smoore lost market share between 2019 and 2023, Smoore's tactics permitted it to slow the pace of market share loss and retain a dominant market share of 50-60% as late as 2023. *Id.* ¶¶ 35, 78.

As an aspect of this scheme, Smoore filed a Complaint for patent infringement with the ITC alleging that NLV had infringed three patents. *Id.* ¶ 18. One was the '623 patent, which purportedly encompassed all accused NLV vaporizer products. *Id.* ¶ 20. During the course of the ITC investigation, NLV learned that the '623 patent was obtained through fraud on the United States Patent & Trademark Office ("USPTO") and thus was unenforceable. *Id.* ¶ 21.

As the ITC ALJ found, "in late 2014 and early 2015, Smoore, through an employee of its intellectual property department named Wenjian Qi, learned of an abandoned patent application submitted by inventor Xiaolin Fang. Qi and Fang reached an agreement whereby a company headed by Mr. Qi's wife would purchase the abandoned application. Qi then worked with a patent prosecutor to revive the patent application by fraudulently asserting that the delay in filing the [required] reply to the notice of abandonment was unintentional. After the patent ('623) was issued from continuations of this application, Smoore purchased the patent from the company headed by Mr. Qi's wife." *Id.* ¶ 44 (citing AA&C, Ex. 2 at 91-92). The ALJ's conclusion was crystal clear:

> There is only one conclusion that a reasonable factfinder can draw from this record evidence: [patent prosecutor] Mr. Cheng knowingly

1  submitted a false declaration about the reason the '553 application
2  [leading to the '623 patent] was abandoned. I so find.

3  AA&C ¶ 48 (quoting AA&C, Ex. 2 at 93). The ITC ALJ also found:

4  … the declaration submitted by Mr. Cheng was material to the
   subsequent issuance of patents maturing from the '553 application,
5  which includes the '623 patent asserted in this investigation, because the
6  Patent Office would never have revived the '553 application had Mr.
   Cheng not submitted the declaration.
7

8  AA&C, Ex. 2 at 93. The ITC ALJ therefore found that the '623 patent was
9  unenforceable due to inequitable conduct. AA&C, Ex. 2 at 94. The ITC ALJ also
10 dismissed Smoore's claims arising from the two patents at issue in this case.
11 AA&C ¶ 22. Smoore's prior U.S. counsel learned during discovery in the ITC action
12 (at the latest) that the '623 patent was obtained by a materially false declaration and
13 yet continued to press Smoore's claim to the ITC. AA&C ¶ 21.

14    **IV.    NLV'S ANTITRUST COUNTERCLAIMS SHOULD NOT BE
             STAYED OR BIFURCATED.**
15

16        **A.    Bifurcation is Unwarranted and Premature.**

17              **1.    Bifurcation Would Require Two Trials and
                       Would Thereby Waste Judicial Resources.**
18

19 Rule 42(b) affords courts discretion to bifurcate claims in order to preserve
20 judicial resources and avoid jury confusion or prejudice. *See* Fed. R. Civ. P. 42(b).
21 "The party requesting bifurcation has the burden of proving that bifurcation is
22 justified given the particular circumstances." *Michael Kors, L.L.C. v. Chunma U.S.A.,*
23 *Inc.*, *et al.*, 2017 WL 5665003, at *1 (C.D. Cal. Aug 30, 2017) (Birotte, J.). The
24 advisability of bifurcation is best determined after fact discovery and motion practice
25 have clarified whether "handling the trial by chapters" is appropriate. *Netflix, Inc. v.*
26 *Blockbuster, Inc.*, 2006 WL 2458717, at *10 (N.D. Cal Aug 22, 2006). Thus, in
27 *Michael Kors*, this Court bifurcated the liability and damages trials of a trademark
28 action after two years of litigation had made clear that the liability phase could be

6

dispositive of the damages issue and that bifurcation would not require impaneling separate juries for each action. *See Michael Kors,* 2017 WL 5665003, at *2.

Bifurcation may double the amount of time required to complete related actions. *See Zenith Elecs., LLC, et al. v. Sceptre, Inc.*, 2015 WL 12830689, at *2-3 (C.D. Cal. Feb. 5, 2015). Bifurcation thus is inappropriate where, as here, patent and antitrust cases involve intertwined facts but resolution of the patent case does not potentially dispose of the antitrust action. *Id.*; *see also Dentsply Int'l, Inc. v. New Tech. Co.*, 1996 WL 756766 (D. Del. Dec 19, 1996). Bifurcation of such actions slows resolution of the overall case and is likely to "devolve into a series of time-consuming and expensive discovery disputes as to whether particular discovery is directed at the patent or antitrust claims." *Id.* at *6.

"A decision ordering bifurcation is dependent on the facts and circumstances of each case." *Aurora World, Inc. v. Ty, Inc.*, 2011 WL 13185687, at *2 (C.D. Cal. Mar. 14, 2011) (additional citation omitted). Courts often bifurcate patent and antitrust claims where an antitrust counterclaim "attacks the patent infringement lawsuit itself as the wrong which furnishes the basis for antitrust damages." *Hydranautics*, 70 F.3d at 536-537. In such cases, "there is often "not much point in litigating [the] antitrust claims until [the] infringement case [i]s resolved." *Id.* Smoore therefore grounds its request for bifurcation on cases like *Fitbit, Inc. v. Aliphcom*, 2016 WL 7888033 (N.D. Cal. May 27, 2016), where it was "highly likely that the antitrust issues will be resolved or rendered moot upon resolution of patent infringement and validity issues." *Id.* at *2; Mot. at 7.

That is not, however, the situation presented here. While NLV's claims arise from facts intertwined with Smoore's claims, resolution of Smoore's case will not dispose of or even markedly simplify NLV's claims. Smoore's win would establish (at most) that NLV violated the '762 and '763 patents and three design patents. It would not inform whether Smoore's attempt to enforce the '623 patent violated the antitrust laws or whether Smoore's unreasonably restrictive distribution agreements

worked in concert with Smoore's baseless litigation to unreasonably restrain trade or unlawfully monopolize the relevant market.

Smoore argues that "if the jury finds that Smoore's patents are valid" it would "likely lead to the dismissal of NLV's 'sham' counterclaims." Mot. at 5-6. But why? Smoore does not offer any reason that its victory would dispose of NLV's claims, and there is none. Indeed, Smoore concedes that the sham litigation aspect of NLV's claims focuses on the "'623 patent," which "is ***not*** part of Smoore's claims in the instant lawsuit – and NLV admits as much." *Id.* at 18 (emphasis in original). This case is thus different from *Edwards Vacuum, LLC v. Hoffman Instrumentation Supply Inc*, 556 F. Supp. 3d 1156, 1180 (D. Or. 2021), on which Smoore relies, in which the defendant's counterclaim rose or fell depending on the reasonableness of the plaintiff's enforcement efforts. *See* Mot. at 4-6.

On the contrary, bifurcation here would simply mandate two trials. That approach would be spectacularly inefficient because many of the same facts and witnesses would have to be presented in each trial. For example, third party and Smoore distributor Jupiter Research, LLC has knowledge related to: (1) the validity of two of the patents involved in Smoore's case; (2) the effects of Smoore's effort to litigate the '623 patent; and (3) Smoore's other anticompetitive practices, including its distribution agreements and restrictions on distributors. Jupiter's representatives would therefore have to be called for both trials. Other third parties are likely similarly situated.

Both the Chairman of Smoore and NLV's principal would also have to be called twice to testify about the prosecution, conception, reduction to practice, claim construction, and prior art of all three patents, as well as various business practices relevant to the antitrust claims. Other senior-level personnel would be in a similar position. And experts for both sides would need to be called (and paid) to testify in each trial regarding NLV's and Smoore's sales data and the nature of the market. This list is exemplary, not exhaustive.

Such duplication carries real-world consequences beyond wasting the Court's time and the litigants' money. Sequential trials would likely mean separate juries evaluating the credibility of the same witnesses on overlapping topics. Trial objections challenging the relevance, permissibility or necessity of certain evidence in light of the outcome of the other trial are virtually certain. Bifurcation also would require both juries to make credibility assessments without live testimony from key witnesses regarding all issues pertinent to both cases and would create the possibility of inconsistent results and collateral challenges to both verdicts.[2]

### B.    NLV's Amended Complaint and Discovery Requests Do Not Justify Bifurcation.

Smoore's original motion to bifurcate and stay was a two-page afterthought; it is now the centerpiece of Smoore's Motion. Smoore justifies its new approach by focusing on this Court's Order appointing Special Master Olson and the Court's comments at the scheduling conference to the effect that this case is complicated. *See* Mot. at 3 (citing ECF No. 79) (Order Appointing Special Master). But the Court largely addressed the complexity issue by appointing Special Master Olson, who is well-positioned to address the various overlapping issues in the case in a timely manner and to minimize expenditure of judicial resources.

More to the point, bifurcation would drag out rather than reduce the complexity of this action. Putting off the difficult part of a job does not make it any easier in the long run. Experience dictates that the years-long piecemeal litigation of overlapping issues virtually guarantees a protracted litigation schedule, duplicative work, and needless resource expenditure.[3]

---

[2] There are potentially other difficult to predict problems as well. Smoore is based in China, meaning certain witnesses could appear for Smoore's case and then find themselves unavailable for NLV's case. This would be especially problematic if documents impeaching the witnesses' credibility were produced after the Smoore trial but before NLV's trial. Other similar complications are predictable.

[3] Smoore also cites the parties' Joint Rule 26(f) Report to argue that bifurcation will result in: "(1) an earlier trial date, and (2) roughly half the trial days needed."

9

NEXT LEVEL VENTURES'S OPPOSITION TO SHENZHEN SMOORE'S MOTION TO BIFURCATE AND STAY ANTITRUST
COUNTERCLAIMS, OR DISMISS AMENDED COUNTERCLAIMS AND STRIKE AFFIRMATIVE DEFENSES

Bifurcation would also run contrary to L.R. 16-15 (encouraging disposition of civil litigation by settlement). It will be challenging for Smoore and NLV to discuss resolution until after discovery has clarified the strength and weakness of the various claims, particularly NLV's claims, which were not presented to the ITC ALJ. Staying the antitrust case is therefore likely to delay settlement discussions (if any) until well after the first trial of Smoore's claims. At minimum, bifurcation would severely prejudice NLV's ability to negotiate before the antitrust case is well-advanced. *See Procter & Gamble Co. v. CAO Group, Inc.*, 2013 WL 6061103, at \*3 (N.D. Ohio. Nov. 18, 2013) (bifurcation denied in part because of prejudice to defendant's settlement position).

### C.    The Prejudice Analysis Favors NLV and Smoore's Jury Confusion Arguments Are Premature.

Smoore also argues bifurcation is appropriate because the jury might be confused or Smoore prejudiced by the simultaneous presentation of Smoore's and NLV's claims. Mot. at 6-7. Any theoretical prejudice to Smoore, however, must be weighed against the certain prejudice to NLV of delaying resolution of its claims for what would likely be years. That risk weighs against bifurcation. *See Procter*, 2013 WL 6061103, at \*3 (bifurcation denied in part because of the risk "witnesses may become unavailable or have their memories fade while the patent issues are litigated.").

Smoore's arguments regarding juror confusion and prejudice are premature given that neither the Court nor the parties yet know what evidence will be presented to the jury and in what format. Nor has there been an opportunity to evaluate less draconian approaches to addressing prejudice or confusion through jury instructions or targeted evidentiary limitations. *See Netflix*, 2006 WL 2458717, at \*10 (denying

---

Mot. at 4. This argument is obviously misleading. Smoore's proposal contemplates two separate trials that would collectively require more days than a single trial of all claims. The second trial would necessarily take place well after a first trial given the need to undertake antitrust-related discovery.

10

bifurcation at the outset of discovery without prejudice to either side to seek bifurcation at the pretrial conference). The Court should not bifurcate this case without a complete understanding of the evidence to be presented and the availability and effectiveness of trial options that would address Smoore's purported concerns.

### D. Staying NLV's Antitrust Claims Would Not Promote Judicial Economy.

Staying NLV's claims is a bad idea for the same reasons bifurcation is a bad idea. Smoore's primary argument in favor of a stay is that antitrust litigation is expensive. *See* Mot. at 8. Which it is, for both sides. Smoore at least could have avoided its share of the expense by policing its conduct from the outset; NLV did not have that option. *Cf. Dentsply*, 1996 WL 756766, at *6 (Court was "skeptical" about plaintiffs' concern for expense because "they should have expected an antitrust counterclaim, now commonplace in patent litigation.").

In any event, the relevant question is whether delaying NLV's case will reduce the expense of litigating this case. The answer is no, because resolution of Smoore's patent case will not resolve or even significantly narrow NLV's antitrust claims. Indeed, some costs would likely increase because witnesses would need to be deposed twice, documents would need to be reviewed and categorized by relevance to each claim, and the parties would litigate over what discovery belongs in which phase. *See id*. Smoore's proposal would merely delay certain costs until the passage of time has significantly prejudiced NLV's case. Smoore's request for delay is understandable given Smoore's historic practice of using litigation to force less well-resourced competitors like NLV out of the market. But this Court should not indulge Smoore's interest.

### V. SMOORE'S MOTION TO DISMISS NLV'S COUNTERCLAIMS SHOULD BE DENIED

#### A. Applicable Legal Standards.

Courts evaluating a Rule 12(b)(6) motion must accept as true all allegations of

11

NEXT LEVEL VENTURES'S OPPOSITION TO SHENZHEN SMOORE'S MOTION TO BIFURCATE AND STAY ANTITRUST COUNTERCLAIMS, OR DISMISS AMENDED COUNTERCLAIMS AND STRIKE AFFIRMATIVE DEFENSES

material fact and construe all inferences in the light most favorable to the non-moving party. *See Moyo v. Gomez*, 32 F.3d 1382, 1384 (9th Cir. 1994). A complaint should not be dismissed where a plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Just as a conspiracy is "not to be judged by dismembering it and viewing its separate parts," (*Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)), exclusionary schemes should be considered in their totality. *United States v. Grinnell Corp.*, 384 U.S. 563, 576 (1966). "[W]hen a plaintiff alleges that a scheme or course of conduct was anticompetitive, the scheme or conduct must be considered as alleged, not in manufactured subcategories." *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 355 (4th Cir. 2024) (reversing district court that "erroneously 'compartmentalized' the various aspects of Duke's anticompetitive conduct and asked whether each one, *independently*, was unlawful" in monopolization case) (emphasis in original).

### B. The *Noerr-Pennington* Doctrine Does Not Insulate Smoore from Liability.

Smoore is not entitled to *Noerr-Pennington* immunity because Smoore knowingly relied on a fraudulent declaration to the USPTO to obtain the '623 patent and then tried to enforce that patent before the ITC.

"In *Noerr*, the Supreme Court held that no violation of the Sherman Act may be predicated upon the defendant's attempts to influence the passage or enforcement of laws." *Hydranautics*, 70 F.3d at 537 (citing *Eastern R. R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 135 (1961)). There are two recognized exceptions. The "sham litigation" exception applies where a litigant either: (1) engages in objectively baseless litigation intended only to "interfere directly with the business relationships of a competitor," *Noerr*, 365 U.S. at 144; or (2) seeks to enforce a patent obtained through intentional fraud. *Hydranautics*, 70 F.3d at 537-8. The "*Walker Process*" exception applies where a defendant obtains or maintains a monopoly by

virtue of knowing and willful fraud on the USPTO. *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965) (Harlan, J., concurring)). The "sham litigation" exception and the *Walker Process* exception both "provide alternative legal grounds on which a patentee may be stripped of its immunity from the antitrust laws" and "both legal theories may be applied to the same conduct." *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1071 (Fed. Cir. 1998).

"[C]ourts rarely award *Noerr-Pennington* immunity at the motion to dismiss stage, where the Court must accept as true the non-moving party's well-pleaded allegations with respect to sham litigation." *See Relevant Grp. LLC v. Nourmand*, 2022 WL 2189535, at *3 (C.D. Cal. Mar. 4, 2022) (additional citation omitted). NLV's fraud allegations here are drawn directly from the ITC ALJ's conclusions.

### 1.    NLV Has Sufficiently Pleaded a *Walker Process* Claim.

Although Smoore ignores the *Walker Process* exception, NLV's allegation that Smoore maintained its monopoly in part by submitting a materially false declaration to the USPTO to obtain the '623 patent states a *Walker Process* claim.

A *Walker Process* claim requires that: (1) the relevant patent was "procured by knowing and willful fraud practiced by the defendant on the Patent Office …"; and (2) the other elements of a [Section 2] monopolization charge are proven. *Walker Process*, 382 U.S. at 179 (Harlan, J., concurring). Only the fraud element must be pleaded with specificity. *Bal Seal Eng'g, Inc. v. Nelson Prod., Inc.*, 2016 WL 11495986, at *6 (C.D. Cal. Dec. 7, 2016).[4]

NLV alleges that Smoore obtained the '623 patent by submitting a false declaration to the USPTO that was material to the issuance of the '623 patent. AA&C ¶¶ 21-22, 44, 47-48. Although Smoore spends several pages trying to minimize its

---

[4] Smoore's citation to *Kottle v. Nw. Kidney Centers*, 146 F.3d 1056, 1063 (9th Cir. 1998), Mot. at 22, confuses the pleading standard. *Kottle* involved the narrower exception to *Noerr-Pennington* applicable to administrative rather than judicial proceedings. *See id.*; Mot. at 16. In the litigation context, only allegations of fraud are subject to a heightened pleading standard. *Empress LLC v. City & Cnty. of San Francisco*, 419 F.3d 1052, 1056 (9th Cir. 2005).

conduct (Mot. at 17-18, 20-21), the ITC ALJ's findings amply demonstrate intentional fraud. *See* Section III., *supra* (reciting ITC ALJ's findings). NLV's claims are thus sufficient to satisfy the fraud element of the *Walker Process* exception. *Walker Process*, 382 U.S. at 179. Smoore does not challenge the other elements of NLV's monopolization claims aside from market definition, which is addressed in Section V.C., *infra*.[5]

### 2.    NLV's Claims Satisfy the Sham Litigation Exception.

NLV's claims also fall within the "sham litigation" exception. The sham litigation exception applies where a defendant causes antitrust injury[6] by pursuing patent litigation that is objectively baseless and "motivated by a desire to interfere *directly* with the business relationships of a competitor." *Bal Seal*, 2016 WL 11495986, at *5 (emphasis in original) (cleaned up). The sham litigation exception is also satisfied where a litigant causes antitrust injury by attempting to enforce a patent obtained by fraud. *Hydranautics*, 70 F.3d at 537-38. Smoore's attempted enforcement of the '623 patent satisfies the sham litigation exception. *See Hydranautics*, 70 F.3d at 537-38; *Consumerinfo.com, Inc. v. Chang*, 2009 WL 10673208, at *4 (C.D. Cal. Nov. 12, 2009).

### 3.    There Is No Requirement that a Sham Litigation Claim Arise from Pending Litigation.

Smoore argues that NLV cannot satisfy the sham litigation exception because "NLV has [] pled nothing that could plausibly support a finding that the **current lawsuit** is objectively meritless, as required." *See* Mot. at 18 (emphasis in original).

---

[5] Smoore cites to *Nobelpharma*, 141 F.3d 1059 (Mot. at 16-17 n.5), but the substance of the case forecloses Smoore's *Noerr-Pennington* immunity argument. *See Nobelpharma*, 141 F.3d at 1073 (finding of *Walker Process* fraud where a book material to the patent was fraudulently kept from the USPTO).

[6] Smoore does not dispute that its conduct caused NLV antitrust injury. NLV alleges that Smoore's efforts to enforce the fraudulently obtained '623 patent cost NLV at least $3 million of damages and the loss of significant business to Smoore. *See* AA&C ¶¶ 57-58; *Cf. Bal Seal*, 2016 WL 11495986, at *7 (counterclaim plaintiff pleaded antitrust injury where fraud committed on the USPTO cost the plaintiff the time and money spent defending the case, lost business, and increased costs).

Smoore cites no authority for this proposition, and there is none. The Ninth Circuit in *Hydranautics* (which Smoore cites elsewhere) specifically considered whether the *Noerr-Pennington* doctrine insulated a prior patent enforcement action seeking to enforce a patent allegedly obtained by fraud. *See Hydranautics*, 70 F.3d at 538-39. The court concluded that such claims could not be dismissed "short of summary judgment or trial." *Id.* at 539.

Smoore's protest that the ITC decision was not influenced by Smoore's misrepresentation to the USPTO is irrelevant. *See* Mot. at 20. Smoore's false declaration to the USPTO triggered the *Walker Process* exception regardless of its effect on the ITC proceedings. *See Hydranautics*, 70 F.3d at 537-8; *Bal Seal*, 2016 WL 11495986, at \*7. Moreover, Smoore's former counsel continued to press Smoore's infringement claim after counsel knew of their client's earlier fraud. *See* Section III., *supra*. Pursuing a claim known to be baseless is the definition of sham litigation.

### 4. Smoore's Effort to Enforce a Fraudulently Obtained Patent is Part of a Larger Scheme that is not Insulated by *Noerr-Pennington*.

Even were the Court to find that no sham litigation or *Walker Process* exception applies—which would be error—Smoore's false statements to the USPTO could still be considered as part of Smoore's broader anticompetitive scheme, which of course is not protected by *Noerr-Pennington*. *See In re Pandora Media, LLC*, 2022 WL 19299126, at \*8 (C.D. Cal. Oct. 26, 2022) ("[E]ven when litigation itself is immunized, a litigant cannot avail itself of *Noerr-Pennington* immunity when the litigation is used to enforce an unlawful scheme.").

Here, NLV alleges that Smoore's patent enforcement action enabled Smoore to undertake further action to exclude competitors from the closed systems market, including: (1) using uncertainty created by the patent litigation to poach NLV's customers; (2) harming NLV's business and reputation by falsely claiming NLV would be liable for patent infringement; and (3) entering into exclusionary settlement

15

agreements to force competitors out of the market.[7] AA&C ¶¶ 56-58. Smoore also entered into collusive and coercive distribution agreements that foreclosed most distribution channels and forced NLV and other nascent competitors to maintain additional costly sales and distribution infrastructure. *Id.* ¶¶ 79-82. This entire scheme constitutes actionable conduct that is not protected by *Noerr-Pennington*.[8]

## C.    NLV Alleges a Viable Market.

"In the Ninth Circuit, one seeking to bring a claim under Section 2 must plead: (1) that the party against whom the claim is brought 'possesses monopoly power in the relevant market'; (2) that party has 'willfully acquired or maintained that power'; and (3) that party's conduct has 'caused antitrust injury.'" *Bal Seal*, 2016 WL 11495986, at *6. The only element Smoore challenges is NLV's definition of the relevant market.

The boundaries of an antitrust product market "are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe v. United States*, 370 U.S. 294, 325 (1962). "[P]ractical indicia" of an economically distinct market include "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.*

Market definition challenges are disfavored at the pleading stage because the validity of a proposed market is "a factual inquiry into the 'commercial realities'

---

[7] Smoore's claim that its settlements with other defendants in the ITC proceeding were not exclusionary is unpersuasive. *See* Mot. at 18 n.7. If the patent was procured by fraud, it is plausible that the purpose of the settlement agreement was to extend the monopoly. *See Ritz Camera & Image, LLC v. SanDisk Corp.*, 772 F. Supp. 2d 1100, 1110 (N.D. Cal. 2011), *aff'd*, 700 F.3d 503 (Fed. Cir. 2012). *Wonderful Real Est. Dev. LLC v. Laborers Int'l Union of N. Am.*, 2020 WL 91998 (E.D. Cal. Jan. 8, 2020), on which Smoore relies, is inapposite because the plaintiff there did not allege bad faith with respect to the alleged sham litigations. *See* Mot. at 18 n.7.

[8] Smoore's reliance on *Dairy, LLC v. Milk Moovement, Inc.*, 2022 WL 4387981 (E.D. Cal. Sept. 22, 2022) and *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 876 (Fed. Cir. 1985) is misplaced. Neither case involved patents obtained by fraud on the USPTO. *See Dairy*, 2022 WL 4387981, at * 2-3; *Loctite*, 781 F.2d at 877-78.

16

faced by consumers." *High Technology Careers v. San Jose Mercury News,* 996 F.2d 987, 990 (9th Cir. 1993); *Newcal Indus., Inc. v. Ikon Off. Sol.,* 513 F.3d 1038, 1044-45 (9th Cir. 2008) (alleged markets often "survive scrutiny under Rule 12(b)(6) subject to factual testing by summary judgment or trial" because market definition typically turns on factual disputes).

Smoore's shifting market definition arguments illustrate why courts do not resolve market definition disputes at the pleading stage. NLV originally defined the relevant market as "closed cannabis oil vaporizer systems." ECF No. 36 ¶¶ 70-86. Smoore objected that Smoore's products could not be called a "system" because they were not sold filled with cannabis oil. ECF No. 54 at 4. So NLV added the phrase "and components." Smoore's new challenge is that the words "and components" render the market overbroad and "ill-defined." Mot. at 10.

But the market is far from ill-defined. Smoore described in detail and diagrammed the products in the alleged market. *See* Compl. ¶ 20. Both Smoore and NLV sell those products (unfilled) to purchasers who fill the cartridge with cannabis oil, cap it, and then sell the systems on to consumers through various retail outlets. *Id.* ¶ 97. NLV alleges that the market for the sale of these unfilled closed systems is separate from the market for other cannabis delivery systems because: (1) consumers recognize that closed systems offer significant advantages that other systems do not; (2) closed systems generally are sold to different customers than other cannabis delivery systems; (3) manufacturers of closed systems do not typically compete with manufacturers of open systems; and (4) the price of closed systems can be increased a significant and non-transitory amount without losing customers to other delivery systems. AA&C ¶¶ 94-105. These allegations—which Smoore does not challenge—are sufficient to plead that closed systems are a separate market. This Court should not require NLV to play market definition whack-a-mole at the pleading stage.

In any event, Smoore's argument misapprehends the interchangeability inquiry. Interchangeability addresses whether products *outside* the market definition

are economically interchangeable with products *within* the product market, not whether every product within a market is functionally interchangeable. *Brown Shoe*, 370 U.S. at 325 ("The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand *between the product itself and substitutes for it*.") (emphasis added). The relevant question is whether a closed system is economically interchangeable with a product *outside* the relevant market, for example, a cannabis-infused brownie. The relevant question is *not,* as Smoore suggests, whether "mouthpieces are interchangeable with unfilled cartridges." Mot. at 11. That question is entirely academic, because the mouthpiece is useless for cannabis consumption without the cartridge and vice versa. *See* Compl. ¶ 20 (diagram of closed system).

Controlling authority demonstrates that Smoore's approach is wrong. For example, in *Brown Shoe*, a seminal merger case, the Supreme Court approved a market for "women's shoes," even though not all women's shoes are functionally interchangeable (most people would be hard-pressed to play basketball in high heels). *Brown Shoe*, 370 U.S. at 326. Indeed, the Court specifically rejected the (now dated) argument that a proposed market for children's shoes was overbroad because "a little boy does not wear a little girl's black patent pump." *Id.* at 327. And in *Federal Trade Commission v. Qualcomm, Inc.*, 969 F.3d 974, 992 (9th Cir. 2020), which Smoore cites, the Ninth Circuit approved the district court's definition of the relevant market as the market for "modem chips" even though modem chips included both "single mode" and "multimode" chips and modem chips contained "varying features" and thus were not all functionally interchangeable. *Id.*, *approving in part Federal Trade Commission v. Qualcomm, Inc.*, 411 F. Supp. 3d 658, 674 (N.D. Cal. 2019).

### D.    NLV's Allegations of Anticompetitive Contracts Between Smoore and Its Distributors State a Section I Claim.

NLV alleges that Smoore: (1) agreed to anticompetitive distribution agreements, which included draconian exclusive dealing clauses and other

18

impermissible restraints; (2) policed the agreements through continuous monitoring of the conspiracy and bilateral communications with distributors; (3) met with the distributors collectively and individually to agree on distribution terms and price; and (4) punished any distributor attempting to compete. AA&C ¶ 143. These allegations are more than sufficient to allege an unreasonable restraint of trade. *See, e.g.*, *Don Copeland v. Energizer Holdings, Inc.*, 716 F. Supp. 3d 749, 765 (N.D. Cal. 2024) ("[a]t the pleading stage, plaintiffs need only … plausibly allege that the restraint substantially impairs competition in the relevant market ….").

Smoore argues that NLV does not allege "antitrust injury" arising from the agreements. This argument is both legally incorrect and misses the point. The relevant question is not whether any individual practice caused NLV "antitrust injury," but rather whether Smoore's overall scheme to monopolize the market, which included exclusive agreements as well as abusive patent litigation, caused NLV harm. *Duke Energy*, 111 F.4th at 355. Even considered alone, however, Smoore's anticompetitive agreements caused NLV antitrust injury.

Federal courts have recognized the harm from exclusive dealing arrangements in similar situations. *See McWane, Inc. v. F.T.C.*, 783 F.3d 814, 832 (11th Cir. 2015) ("an exclusive dealing arrangement can be harmful when it allows a monopolist to maintain its monopoly power by raising its rivals' costs sufficiently to prevent them from growing into effective competitors.") (citing XI Philip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1804a, at 116-17 (3d ed.2011)).

### E.    NLV Has Plausibly Pleaded Substantial Market Foreclosure.

Smoore's argument that NLV cannot suffer injury from a conspiracy to inflate prices can be disposed of quickly: NLV does not allege injury from price-fixing. *See* Mot. at 11-12.

Smoore next argues that NLV's market foreclosure allegations are inadequate because exclusive dealing arrangements violate the Sherman Act "only if their 'probable effect is to foreclose competition in a **substantial share** of the line of

19

NEXT LEVEL VENTURES'S OPPOSITION TO SHENZHEN SMOORE'S MOTION TO BIFURCATE AND STAY ANTITRUST
COUNTERCLAIMS, OR DISMISS AMENDED COUNTERCLAIMS AND STRIKE AFFIRMATIVE DEFENSES

commerce affected.'" Mot. at 12 (emphasis in original). Perhaps the boldface was intended to distract from Smoore's failure to define the word "substantial." Although no particular level of market foreclosure is dispositive, Courts routinely deem foreclosures of over 50% sufficient. *See Feitelson v. Google Inc.*, 80 F.Supp.3d 1019, 1030 (N.D. Cal. 2015) (citing *U.S. v. Microsoft Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001); Philip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1821c ("Percentages higher than 50 percent are routinely condemned when the practice is complete exclusion by a contract of fairly long duration[.]"). Indeed, a monopolist's use of exclusive contracts may give rise to a § 2 violation even where the contracts foreclose less than 40% to 50% of the market. *See United States v. Google LLC*, 2024 WL 3647498, at *107 (D.D.C. Aug. 5, 2024); *Microsoft*, 253 F.3d 34 at 70-71.

Here, the question is not close: Smoore's exclusive dealing agreements foreclosed NLV from approximately 80% of the market for about four years. AA&C ¶ 78. NLV also alleges substantial barriers to entry to the market, including a lengthy research and development process that requires expensive and particular facilities and equipment, and exhaustive testing both in bench samples and at scale. *Id.* ¶¶ 106-109. Smoore's conduct thus vastly increased NLV's costs and effectively thwarted NLV's ability to achieve economies of scale. *Id.* ¶¶ 80-82. NLV was also dropped by a distributor, forced to maintain costly sales and distribution infrastructure, and incurred costs such as trade marketing and inventory maintenance that would otherwise be borne by distributors. *Id.* ¶¶ 75-82. These allegations are more than sufficient at the pleading stage.

## F.    Smoore's Declining Market Share Does Not Insulate It from Liability.

Smoore's remaining argument is that Smoore's market share loss during the relevant period suggests that Smoore did not substantially foreclose the market. Mot. at 14. This argument is premature. Federal courts have recognized substantial foreclosure claims where "the targeted rival gained market share—but less than it

likely would have absent the conduct." *McWane*, 783 F.3d at 838 (citing *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 789-91 (6th Cir. 2002)). The relevance of declining market share is thus a fact-intensive question that depends on the facts of each case. *Safeway Inc. v. Abbott Lab'ys*, 761 F. Supp. 2d 874, 890 (N.D. Cal. 2011) (relevance of declining market share "is for a jury to decide."); *Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 366 (9th Cir. 1988) ("declining market share may reflect an absence of market power, but it does not foreclose a finding of such power."); *Cf. Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1440 (9th Cir. 1995).[9] NLV's allegations of market foreclosure and substantial barriers to entry are ample at this stage.

### G.    NLV's California Cartwright Act Counterclaim Is Sufficiently Pleaded.

The Cartwright Act "is California's version of the federal Sherman Act and sets forth California's antitrust laws." *Cellular Plus, Inc. v. Superior Court of San Diego Cnty.*, 14 Cal.App.4th 1224, 1232 n.2 (1993). A plaintiff that states a claim for violation of the Sherman Act also states a claim for violation of the Cartwright Act. *See Solyndra Residual Tr. by & through Neilson v. Suntech Power Holdings Co.*, 62 F. Supp. 3d 1027, 1046 (N.D. Cal. 2014). As NLV has successfully stated a claim under the Sherman Act, NLV has also stated a claim under the Cartwright Act.

### H.    NLV's Induced Infringement Counterclaim Is Sufficiently Pleaded.

Contrary to Smoore's arguments, NLV sufficiently pleaded indirect infringement claims providing a basis for Smoore's pre-suit knowledge. As NLV explained, Smoore had pre-suit knowledge of the '294 Patent through a former NLV employee who received extensive training on NLV's intellectual property and products covered by the '294 Patent, who then joined Smoore to make videos

---

[9] *Omega Envtl. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997), on which Smoore relies, is not instructive here because it arose after a jury trial and involved foreclosure of a much smaller portion of the market. *Id.* The court in *Omega* held that a jury's conclusion that exclusive dealings arrangements foreclosed about 38% of the market "substantially overstated" the arrangements' effects. *Id.* at 1161-64.

demonstrating how to use Smoore's Accused products. *See Avocent Huntsville, LLC v. ZPE Sys., Inc.*, 2018 WL 1411100, at *20 (N.D. Cal. Mar. 21, 2018) (It is "sufficient to clear the plausibility hurdle with respect to pre-suit knowledge of the asserted patents" when patentee alleges "specific former employees, [] worked in the particular department that designed and developed the specific technology employed in the accused product."). Moreover, NLV "need not allege pre-suit knowledge for its indirect and willful infringement claims based on [] post-suit conduct." *Cranial Techs., Inc. v. Ottobock SE & Co. KGaA*, 2023 WL 8115126, at *2 (C.D. Cal. Nov. 2, 2023).

As such, NLV has sufficiently pleaded Smoore's pre-suit knowledge of the '294 Patent, and NLV's induced infringement claim should not be dismissed.

## VI.    NLV'S AFFIRMATIVE DEFENSES ARE PROPERLY PLEADED

### A.    NLV's Affirmative Defenses of Noninfringement (1st), No Willful Infringement (7th), Statutory Limitation on Damages (5th), and No Exceptional Case (8th) Are Proper.

Affirmative defenses should not be struck if "their presence in the Answer does not prejudice Plaintiffs." *Ecological Rts. Found. v. Hot Line Constr., Inc*., 2021 WL 1537205, *1 (C.D. Cal. Feb. 17, 2021) (Birotte, J.). If there is any doubt that the defense may succeed, the motion to strike should be denied. *MACOM Tech. Sols. Holdings, Inc. v. Infineon Techs. AG*, 2017 WL 3298670, at *2 (C.D. Cal. Aug. 2, 2017).

"Non-infringement is a valid affirmative defense as recognized by the Patent Act itself. 35 U.S.C. §282(b)(1)." *Juno Therapeutics, Inc. v. Kite Pharma*, 2018 WL 1470594, *5 (C.D. Cal. Mar. 8, 2018). Section 282(b)(1) states "Noninfringement" "shall be defenses in any action involving the validity or infringement of a patent and *shall be pleaded*." 35 U.S.C. §282(b)(1) (emphasis added). Similarly, NLV's affirmative defense of no willful infringement is also valid. Furthermore, NLV provides fair notice of noninfringement (and therefore no willful infringement) by

summarizing the ITC's findings of no infringement of the same Asserted Patents in this Action by NLV's cartridges that are also accused in this case. *See* AA&C ¶¶ 19, 22, 128-130, 135-136.

Statutory limitation on damages and no exceptional case affirmative defenses are likewise allowed in the Ninth Circuit. *See In re Washington Mut., Inc. Sec., Derivative & ERISA Litig.,* 2011 WL 1158387, at *2 (W.D. Wash. Mar. 25, 2011) (declining to strike affirmative defense for no attorneys' fees, as it is "related to the litigation and [is] not immaterial, impertinent or scandalous."); *see also Dodocase VR, Inc. v. MerchSource,* LLC, 2020 WL 363040, *5 (N.D. Cal. Jan. 22, 2020) ("district courts [] generally permit defendants to employ [limitations on damages and costs] as affirmative defenses in an answer," finding them "properly asserted.") (citations omitted); *see also Ecological Rts.,* 2021 WL 1537205, *1 (Birotte, J.) (declining to strike affirmative defenses, stating "[e]ven if they are not proper affirmative defenses, their presence in the Answer does not prejudice Plaintiffs...[T]his is an academic question upon which the Court need not expend its resources."). Consistent with this Court's and Ninth Circuit practices, NLV's first, fifth, seventh, and eight affirmative defenses are allowable and should not be struck.

### B. NLV Sufficiently Pleads its Invalidity (2nd), Equitable (4th), Ensnarement (9th), Prosecution History Estoppel (3rd), and License, Patent Exhaustion (6th) Affirmative Defenses.

"[A]ffirmative defense pleadings need only provide fair notice of the defense" *Vestem, Inc. v. Regen Labs LLC,* No. 2:24-cv-02475-AB-PDx, ECF No. 59 at 6 (C.D. Cal. Oct. 10, 2024) (Birotte, J.) (denying application of the *Twombly/Iqbal* standard for pleading affirmative defenses). Affirmative defenses "while boilerplate, are standard affirmative defenses," and are "appropriate at the outset of the case." *Baroness Small Estates, Inc v. BJ's Rests., Inc*., 2011 WL 3438873, at *6 (C.D. Cal. Aug. 5, 2011).

NLV provides fair notice of its invalidity, unenforceability, or ineligibility; equitable defenses; and ensnarement affirmative defenses, including: detailing

23

asserted U.S. Design Patent 853,635 (the "D635 Patent") invalidation proceedings (*see* AA&C ¶¶ 12-17, 53-56); alleging facts that Smoore's "Liquid 6" cartridge used at a 2016 U.S. trade show predating filing of the Chinese priority design application, which "could invalidate," or make unenforceable, the D635 Patent (*id*. ¶13); identifying Smoore's actions in relation to the 2016 trade show which demonstrate Smoore "practicing the prior art" (*id*. ¶17) and provide fair notice of ensnarement; and explaining Smoore's "pattern and practice" of asserting "invalid or unenforceable" patents, including the priority design patent application above, which provides fair notice of equitable defenses (e.g. unclean hands). *Id*. ¶¶ 55-57.

NLV also sufficiently pleaded its prosecution history estoppel/disclaimer defense, which this Court declined to strike in *Regen Labs* because it "does not prejudice Plaintiff." *Regen Labs*, No. 2:24-cv-02475-AB-PDx, ECF No. 59 at 6 (Birotte, J.). Here, too, Smoore is not prejudiced by this affirmative defense. "Because prosecution history estoppel has a particular and limited application," additional factual development in the Answer is not necessary. *Teirstein v. AGA Med. Corp.*, 2009 WL 704138 at *7 (E.D. Tex. Mar. 16, 2009).

NLV also sufficiently pleaded express/implied license, patent exhaustion, and single-recovery rule, by providing an example of how the defense would apply. AA&C at 9:23-10:7. There is no requirement to plead who received a license, type of license, or circumstances leading to license, and even barebone allegations satisfy fair notice requirements. *See Multimedia Pat. Tr. v. DirecTV, Inc.*, 2011 WL 13100718, at *2 (S.D. Cal. Feb. 24, 2011) (not striking barebones defense for doctrines of waiver, equitable estoppel, implied license and/or patent exhaustion, finding "sufficient notice [] and [] no prejudice."). Thus, for each of its second, third, fourth, sixth, and ninth affirmative defenses, NLV alleges sufficient "facts indicating the grounds on which the defense is based" (*Rosen v. Masterpiece Mktg. Grp., LLC*, 222 F. Supp. 3d 793, 802 (C.D. Cal. 2016)), and they should not be struck.

## VII.   CONCLUSION

For the reasons stated above, the Court should deny Smoore's motion to bifurcate and stay and/or dismiss NLV's counterclaims and deny Smoore's motion to strike NLV's affirmative defenses.

Dated: November 15, 2024

Respectfully submitted,

**BRYAN CAVE LEIGHTON PAISNER LLP**

By: */s/ Kristin S. Webb*
Kristin S. Webb

Kristin S. Webb (Cal. Bar No. 258476)
kristen.webb@bclplaw.com
1920 Main Street, Suite 1000
Irvine, California 92614
Tel:  (949) 223-7000
Fax: (949) 223-7100

R. Tyler Goodwyn IV (*Pro Hac Vice*)
Charles E. Tompkins (*Pro Hac Vice*)
tyler.goodwyn@bclplaw.com
charles.tompkins@bclplaw.com
1155 F Street, NW
Washington, D.C. 20004
Tel:  (202) 508-6015
Fax: (202) 508-6200

*Attorneys for Defendant/ Counterclaim-*
*Plaintiff Next Level Ventures, LLC and*
*Defendant Advanced Vapor Devices LLC*