UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No.: | 2:22-cv-07646-AB-AGR | Date: | December 4, 2024 |

| | |
|---|---|
| Title: | *Shenzhen Smoore Technology Co., Ltd. v. Next Level Ventures, LLC, et al.* |

| | |
|---|---|
| Present: The Honorable | **ANDRÉ BIROTTE JR., United States District Judge** |

| Daniel Tamayo | N/A |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Appearing | None Appearing |

**Proceedings:**   **[In Chambers] Order (1) Denying Motion to Bifurcate and Stay; (2) Denying Motion to Dismiss, Except for Limited Granting-In-Part as to Certain Theories Relating to Alleged Noerr-Pennington Exceptions; (3) Denying Motion to Strike Affirmative Defenses; and (4) Vacating December 6, 2024 Hearing.**

## I.    Background

In October 2022, Plaintiff Shenzen Smoore Technology Co., Ltd. ("Smoore") brought this patent infringement action against Defendants Next Level Ventures, LLC and Advanced Vapor Devices LLC (collectively, "NLV"). The Court stayed the cases pending concurrent ITC proceedings. Dkt. 18. In March 2024, after the ITC proceedings concluded, the Court vacated the stay. Dkt. 26. NLV filed an Amended Answer, Affirmative Defenses, and Counterclaims ("CC"). Dkt. 64. The Court conducted a scheduling conference and stayed issuance of a scheduling order until resolution of the pending motion. See Dkt. 62. Smoore moves to bifurcate and stay, or in the alternative dismiss NLV's antitrust-related counterclaims and strike the affirmative defenses. Dkt. 80 ("Mot."). NLV filed its opposition. Dkt. 81 ("Opp."). Smoore filed its reply. Dkt. 85 ("Reply").

The Court has conferred with the Special Master concerning this motion after the Special Master conducted a conference with the parties on December 2, 2024. During that hour-long conference, the Special Master provided a tentative and heard arguments from the parties. Based on the Court's review of the briefing and understanding of the conference with the Special Master, the Court deems this matter appropriate for decision without additional oral argument. The Court **VACATES** the hearing previously scheduled for December 6, 2024. *See* Fed. R. Civ. P. 78; L.R. 7-15.

For the reasons stated in this Order, the Court **DENIES** the motion, with the exception that, the Court **GRANTS-IN-PART** the motion on a limited basis where the specified exceptions to the *Noerr-Pennington* doctrine were not sufficiently pleaded as to certain theories.

## II.    Factual Background

Smoore alleges that NLV infringes U.S. Patent Nos. 10,791,762 (the "'762 Patent"), 10,791,763 (the "'763 Patent"), D817,544 (the "D544 Patent"), D823,534 (the "D534 Patent"), and D853,635 (the "D635 Patent"). Dkt. 1, Compl. ¶ 1. The asserted patents relate to electronic cigarettes with atomizers and certain designs for those devices. *Id.* ¶¶ 9-19. Smoore alleges that NLV sells infringing oil-vaping cartridges with a liquid reservoir for vaporizable oil, some of which include mouthpieces to form atomizers, and some of which include a battery or other power source to form a vaping device. *Id.* ¶ 20.

NLV alleges counterclaims for declaratory judgment of noninfringement of the '762 and '763 Patents, and further alleges that Smoore infringes U.S. Patent No. 11,744,294 (the "'294 Patent") for cartridge packaging systems and methods. *See* CC ¶¶ 125-37, 165-69.

Additionally, NLV alleges antitrust counterclaims relating to conspiracy and monopolization. NLV alleges that Smoore has "resorted to a variety of anticompetitive and illegal tactics" to "maintain its dominant share of the closed cannabis oil vaporizer systems and components market," including by bringing "knowingly fraudulent and abusive patent litigation" and imposing "unreasonably anticompetitive distribution agreements." *Id.* ¶ 10.[1] NLV alleges that Smoore has violated § 1 of the Sherman Act by entering a continuing combination or conspiracy

---

[1] "Closed Cannabis Oil Vaporizer Systems generally consist of a mouthpiece, a reservoir, and atomizer assembly." *Id.* at 12 n.2.

to unreasonably restrain trade and commerce "by artificially reducing or eliminating competition for the pricing of closed cannabis oil vaporizer system products directly sold to United States purchasers," including through its "unreasonably restrictive distribution agreements." *Id.* ¶¶ 139-40 (conspiracy). NLV alleges that these acts also violate § 2 of the Sherman Act by monopolizing the market for closed cannabis oil vaporizer systems. *Id.* ¶ 146 (monopolization). Smoore also alleges attempted violations of § 2 (attempted monopolization) and violations of the California Cartwright Act, Business & Professions Code § 16720 (state law antitrust violation). *See, e.g.*, *id.* ¶¶ 155, 160. Smoore moves to bifurcate and stay discovery on the antitrust-related counterclaims, or in the alternative, to dismiss them and strike affirmative defenses.

## II.    Legal Standards

### A. Bifurcation

Under Federal Rule of Civil Procedure 42(b), "[f]or convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims." This rule "confers broad discretion upon the district court to bifurcate the trial, thereby deferring costly and possibly unnecessary proceedings pending resolution of potentially dispositive preliminary issues." *Zivkovic v. So. Cal. Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002).

"District courts sometimes bifurcate issues for trial in patent cases;" one "common" reason for doing so "is a counterclaim for antitrust based on an allegation that the patent complaint is a sham." FJC Patent Case Management Judicial Guide § 4.6.6 (3d ed. 2016) (citing *In re Innotron Diagnostics*, 800 F.2d 1077 (Fed. Cir. 1986)); *see also id.* ("when an essential element of a claim is related to the outcome of another claim in the suit, as in a sham-litigation antitrust counterclaim, it might make more sense to stay the one claim in its entirety (including discovery) until the underlying claim is adjudicated.") (citing *Prof. Real Estate Investors, Inc. v. Columbia Pictures, Inc.*, 508 U.S. 49, 60 (1993)). Bifurcation in this scenario may be advantageous because "a single issue could be dispositive of the case ... [so] separate trial of that issue may be desirable to save the time of the court and reduce the expenses of the parties." 9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure, § 2388 (3d ed. 2017).

To determine whether bifurcation is appropriate, courts consider several factors, including whether bifurcation would increase convenience and judicial economy, reduce the risk of jury confusion, and avoid prejudice to the parties. *See Hirst v. Gertzen*, 676 F.2d 1252, 1261 (9th Cir. 1982). "The party requesting bifurcation has the burden of proving that bifurcation is justified given the particular circumstances." *Id.* (citing cases).

## B. Dismissal

To defeat a Rule 12(b)(6) motion to dismiss, the complaint must provide enough factual detail to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint must also be "plausible on its face." *Id.* That is, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 570). A plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. Labels, conclusions, and "a formulaic recitation of the elements of a cause of action will not do." *Id.*

A complaint may be dismissed under Rule 12(b)(6) for lacking a cognizable legal theory or sufficient facts alleged under a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). When ruling on a Rule 12(b)(6) motion, "a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (2009) (internal quotation marks omitted).

## III.    Bifurcation/Stay Analysis

Smoore seeks bifurcation of the antitrust-related counterclaims and affirmative defenses and a stay of discovery, asserting that resolving the patent and antitrust claims together will result in "a discovery quagmire, unnecessary expense, inevitable jury confusion, and prejudice to Smoore" in the form of expensive discovery. Mot. at 2; *see also id.* at 6 (listing discovery issues that are asserted to be unique to antitrust claims). Smoore suggests that bifurcation would result in an earlier trial date and shorter trial for the patent claims and "may well eliminate altogether the need for the Court, the parties and a potential jury to address the

antitrust claims." *Id.* at 4; *see also id.* at 5-6 (if jury finds Smoore's patents valid, "sham" litigation counterclaims are moot). Smoore contends that the antitrust counterclaims are "purely a defensive measure" to the patent suit where they could have been brought as standalone claims much earlier. *Id.* at 4, 8.

NLV opposes bifurcation and a stay, arguing that it would result in two trials with overlapping facts and evidence and the risk of conflicting fact findings, plus lead to a host of disputes over whether discovery is patent- or antitrust-related. Opp. at 1-2, 7-9. Further, NLV asserts that resolution of Smoore's patent claims will not dispose of or substantially narrow NLV's antitrust claims, so a stay would not result in the efficiencies discussed in cases favoring patent/antitrust bifurcation. *Id.* at 1, 7-8. NLV contends it would be prejudiced by fading memories, fewer available witnesses, lost evidence, and significantly higher costs caused by two discovery periods and two trials. *Id.* at 2. NLV also contends that a stay would delay the parties' ability to conduct settlement discussions where strengths and weaknesses of various claims have not been clarified. *Id.* at 9-10.

After weighing the competing factors raised by the parties, the Court will exercise its discretion to deny Smoore's request for bifurcation and a stay concerning the antitrust claims.

The Court begins by considering the line of authority on which Smoore relies suggesting "district courts often stay an antitrust counterclaim until the issues of patent infringement and validity are resolved." *Fitbit, Inc. v. Aliphcom*, No. 5:15-CV-04073-EJD, 2016 WL 7888033, at *1 (N.D. Cal. May 27, 2016). "Those courts reason that such a separation simplifies issues, reduces jury confusion, and helps courts manage the volume and complexity of evidence presented to the jury." *Id.* The Court agrees that, in cases where "resolving issues of patent validity and infringement before addressing the antitrust counterclaim may render the antitrust claim moot," a stay likely promotes judicial economy. But this line of cases does not address the scenario presented here where resolving the patent claims may have no substantive impact on the antitrust claims.

Smoore asserts infringement of the '762, '763, D534, and D635 Patents. But a close reading of the counterclaims shows that NLV does not bring an antitrust claim arising from *these* infringement allegations. If it had, a validity finding could moot the counterclaim and thus favor a stay.

Instead, Smoore's counterclaims focus on the theory that Smoore improperly filed an ITC action against "much of the closed cannabis vaporizer market" wherein

it asserted a fraudulently obtained patent, attempting to insulate it by asserting it alongside other patents.[2] *See* CC ¶¶ 18-20, 41, 44-48. The ITC ALJ ultimately found the '623 Patent unenforceable due to inequitable conduct. *Id.* ¶¶ 21-22. NLV asserts that, although Smoore "understandably did not seek to enforce the fraudulently-obtained '623 Patent here," the damage was done because "Smoore's efforts to enforce the fraudulently-obtained '623 Patent substantially damaged both NLV and competition in the closed cannabis oil vaporizer systems and components market as a whole." *Id.* ¶ 24.

NLV alleges that Smoore knew, or should have known, in connection with the ITC proceedings that the '623 Patent was fraudulently obtained, but despite this, Smoore "continued to pursue [the ITC] litigation to drive out competitors, and demanded settlements that were intended to, and did, exclude competitors from the market." *Id.* ¶ 51. Further, NLV asserts that "Smoore's abusive litigation both unreasonably restrained competition in the closed cannabis vaporizer systems market by driving out competitors and damaged NLV by forcing NLV to expend substantial resources defending a case that Smoore knew or should have known was baseless from the start." *Id.*

Against this backdrop, NLV's § 2 monopolization claim asserts that, "Smoore's actions to attempt to enforce the '623 Patent by engaging in sham litigation involving additional patents constitute an abuse of the patent system, as the real goal of this litigation is to attempt to enforce the much broader rights under the '623 Patent, which has been found unenforceable."[3] *Id.* ¶ 147.

Thus, as pleaded, it appears that a validity finding concerning Smoore's asserted patents (the '762, '763, and the design patents) would not moot or narrow the allegations surrounding the alleged improper enforcement efforts of the '623 Patent. This weighs against bifurcation and a stay. *See Monsanto Co. v. E.I. du Pont De Nemours and Co.*, 2009 WL 3012584, *2–*3 (E.D. Mo. 2009) (staying discovery on antitrust counterclaims relating to patent claims since resolving the underlying patent claims could moot the antitrust claims, but allowing discovery to proceed on other antitrust claims not directly tied to the patent infringement claims); *see also*

---

[2] In the ITC action, alongside the '762 and '763 Patent, Smoore asserted U.S. Patent No. 10,357,623 (the "'623 Patent").

[3] Although ¶ 147 refers to "this litigation," in context, because it references enforcing the '623 Patent, which is not asserted in this case, a better understanding of "this litigation" is "such litigation" or "this type of litigation" wherein the '623 Patent is asserted among other patents.

*Ecrix Corp. v. Exabyte Corp.*, 191 F.R.D. 611, 614 (D. Colo. 2000) (bifurcation unwarranted when *Walker Process*-type antitrust claim alleged).

Turning to the guiding factors, the Court finds that bifurcation and a stay would not increase the convenience of the parties and witnesses or promote judicial economy. There is sufficient overlap in the factual issues underpinning both the patent and antitrust claims that requiring two separate discovery periods and two separate trials would require duplicative work by the parties and witnesses. *See, e.g.*, *Netflix, Inc. v. Blockbuster, Inc.*, No. C06-02361 WHA, 2006 WL 2458717, at *10 (N.D. Cal. Aug. 22, 2006) ("Conducting discovery on overlapping [patent and antitrust] issues in tandem will ultimately reduce the expenses and time of this litigation for both parties," as "will consolidating pretrial proceedings.").

Bifurcation and a stay also would not promote judicial economy because it would protract this litigation and require two separate trials over which the Court must preside and require empaneling two separate juries. It would also likely lead to numerous discovery disputes concerning whether requested discovery relates to patent or antitrust matters. *See, e.g.*, *Kimberly-Clark Worldwide, Inc. v. First Quality Baby Prod.*, LLC, No. 1:CV-09-1685, 2011 WL 1627052, at *3 (M.D. Pa. Apr. 29, 2011) (denying stay of discovery on antitrust counterclaims where case was already two years old and to avoid "a long litany of time-consuming and costly [scope of] discovery disputes which would monopolize the parties and the court's time").

As to likelihood of jury confusion, the Court finds it speculative to guess which claims will remain at the time of trial. The Court believes that, with careful instruction, a jury likely will be able to delineate the relevant factual issues and legal standards applicable to the remaining claims.

Finally, the Court finds that, although it may be more convenient for Smoore to bifurcate discovery because doing so would reduce the initial discovery burden, this resource-related prejudice is outweighed by the evidence-related prejudice that NLV would likely face by bifurcation and a stay. In this situation, courts have denied bifurcation and a stay of patent/antitrust claims. *See, e.g.*, *Procter & Gamble Co. v. CAO Group, Inc.*, 2013 WL 6061103, *3 (S.D. Ohio 2013) (denying motion to bifurcate patent misuse affirmative defense and antitrust counterclaim where "[w]itnesses who provide testimony regarding market and sales data relevant to patent damages may later be called to provide testimony regarding market share and market power relevant to the antitrust claims;" "out-of-state witnesses would need to be re-deposed [and] would drive up the costs and burden on Defendant;" "witnesses may become unavailable or have their memories fade while the patent

issues are litigated;" Defendant may also "be prejudiced in a settlement negotiation if it is unable to develop evidence regarding its affirmative defenses and counterclaims"). Because NLV's counterclaims rely, at least in part, on information it learned during the ITC proceedings, the Court does not find that NLV could have avoided the prejudice of delay by brining its antitrust suit earlier.

Although the Court is denying Smoore's request for bifurcation, it is without prejudice to renewal if "the evidence discovered ultimately justifies handling the trial by chapters." *Netflix*, 2006 WL 2458717, at *10 (denying bifurcation of patent/antitrust claims without prejudice to either side later seeking bifurcation at the pretrial conference); *see also Matsushita Elec. Indus. Co., Ltd. v. CMC Magnetics Corp.*, 2007 WL 219779 (N.D. Cal. 2007) (same).

## IV.    Dismissal/Strike Analysis

If the Court declines to bifurcate and stay the antitrust-related claims, in the alternative, Smoore seeks dismissal of the counterclaims and striking of the affirmative defenses. Mot. at 9.

### A. Relevant Product Market

*First*, Smoore contends that NLV fails to allege a relevant product market, which is required for antitrust claims. Mot. at 10. Smoore argues that NLV's proposed market of "closed cannabis oil vaporizer systems and components" disregards the requirements for "reasonable interchangeability of use and cross-elasticity of demand" by "lump[ing] together various non-interchangeable components with fully-assembled systems that are sold at different points in the supply chain by different sets of competitors." *Id.* at 10-11.

NLV responds that it has "described in detail and diagrammed the products in the alleged market." Opp. at 17 (citing Compl. ¶ 20); *see also* CC ¶ 98. Further, NLV alleges "the market for the sale of these unfilled closed systems is separate from the market for other cannabis delivery systems because: (1) consumers recognize that closed systems offer significant advantages that other systems do not; (2) closed systems generally are sold to different customers than other cannabis delivery systems; (3) manufacturers of closed systems do not typically compete with manufacturers of open systems; and (4) the price of closed systems can be increased a significant and non-transitory amount without losing customers to other delivery systems." Opp. at 17-18 (citing CC ¶¶ 94-105).

An antitrust product market is defined "by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe v. United States*, 370 U.S. 294, 325 (1962). Economically distinct markets may be identified through "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.*

NLV's definition of closed cannabis oil vaporizer systems and components is sufficient at the pleadings stage because it provides notice of its monopolization theory, including that closed systems are not reasonably interchangeable with open systems or other means of cannabis delivery.[4] *See* CC ¶¶ 27-29, 88-105. Any factual disputes regarding NLV's market definition are not properly resolved at this stage. *See Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1044-45 (9th Cir. 2008) (alleged markets often "survive scrutiny under Rule 12(b)(6) subject to factual testing by summary judgment or trial" because market definition typically turns on factual disputes).

## B. Antitrust Injury

*Second*, Smoore states that NLV's counterclaims do not state a claim for relief because they fail to allege antitrust injury to NLV arising from Smoore's alleged inflated prices, which, if true, would benefit NLV because it could charge more for its own products. Mot. at 11-12.

NLV responds that the relevant question is "whether Smoore's overall scheme to monopolize the market, which included exclusive agreements as well as abusive patent litigation, caused NLV harm," not whether higher prices standing alone caused harm. Opp. at 19. Further, NLV clarifies that it does not allege price fixing, so Smoore's argument is moot. *Id.*

Section 1 of the Sherman Act declares "[e]very contract, combination ..., or conspiracy, in restraint of trade or commerce ... to be illegal." 15 U.S.C. § 1; *see also Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 981 (9th Cir. 2023). NLV's counterclaims allege that Smoore's distributor agreements illegally restrain trade through numerous provisions. *See* CC ¶¶ 59-82. NLV alleges it was harmed by, *e.g.*,

---

[4] The relevant inquiry is not whether components of the closed system (*e.g.*, mouthpiece, cartridge) are interchangeable with each other where NLV alleges that the relevant market is the systems (*i.e.*, including all pieces).

being unable to access distribution opportunities. *Id.* ¶¶ 75-76; *see also id.* ¶¶ 80, 144-45 (summarizing forms of harm). Thus, the counterclaims sufficiently allege antitrust injury.

### C. Market Foreclosure

*Third*, Smoore avers that NLV fails to allege it was substantially foreclosed from the relevant market where it admits Smoore's market share was in decline and NLV had access to other distribution channels (*e.g.*, self-distribution). Mot. at 12-15. Relatedly, Smoore contends that NLV fails to plead a "dangerous probability" of monopolization where NLV acknowledges Smoore's market share decline. Mot. at 21-22.

NLV responds that its allegations—that Smoore foreclosed NLV from approximately 80% of the market for about four years—are sufficient to meet the definition of "substantial," which is often met at 50%. Opp. at 20 (citing CC ¶ 78).

Exclusive dealing violates the Sherman Act only if "foreclose[s] competition in a substantial share of the line of commerce affected." *Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997). Showing foreclosure of 40-50% of the market qualifies as a "substantial share." *Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1030 (N.D. Cal. 2015).

NLV has sufficiently pleaded substantial foreclosure as required. NLV's allegations that Smoore's market share declined to around 50% (CC ¶ 103) is not inconsistent with alleging that Smoore substantially foreclosed NLV from competing in the relevant market during the relevant time frame, or its allegations that the alleged anticompetitive activities result in at least a dangerous probability of monopolizing the market. CC ¶¶ 154, 156. Smoore argues that market entry by a new participant who increases market share precludes a finding that exclusive dealing constitutes a barrier to entry (Reply at 13), but the paragraphs that Smoore cites do not identify market entry by a new participant (CC ¶¶ 34-35). Rather, they allege that, although Smoore began to lose market share, its anticompetitive activity "slowed the rate at which Smoore lost market share, and enabled Smoore to maintain a dominant share of the market." *Id.* ¶ 35. Factual questions regarding the duration and terminability of exclusive agreements cannot be resolved at this stage.

D. Noerr-Pennington Immunity

*Fourth*, Smoore contends that NLV's antitrust claims—asserting that Smoore unlawfully excludes its competitors by enforcing its patent rights—are barred by the First Amendment and the *Noerr-Pennington* doctrine. Mot. at 15-16 (citing *Prof'l Real Estate Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56 (1993) (*hereinafter*, "*PRE*") ("Those who petition government for redress are generally immune from antitrust liability.")). Smoore contends that NLV fails to plead specific allegations demonstrating that a *Noerr-Pennington* exception applies. For example, NLV does not plead that Smoore's claims are objectively baseless. *Id.* at 17-18; *see also id.* at 18-20 (arguing nothing from ITC proceedings or China enforcement action shows objective baselessness, and no allegation regarding effect on U.S. commerce). Smoore also avers that NLV fails to meet the Ninth Circuit's pattern of baseless suits exception, if it applies.

NLV responds that it has properly pleaded a *Walker Process* claim, which is an exception to the *Noerr-Pennington* doctrine. Opp. at 13-14. Specifically, NLV alleges that "Smoore obtained the '623 patent by submitting a false declaration to the USPTO that was material to the issuance of the '623 patent," which is supported by the ALJ's findings. *Id.* (citing *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965) (Harlan, J., concurring) (exception to *Noerr-Pennington* doctrine applies where patentee obtains or maintains monopoly through knowing and willful fraud on the PTO)). NLV also argues that it meets the "sham litigation" exception by pleading that it was injured via damages and loss of business by Smoore's attempted enforcement of the fraudulently obtained '623 Patent. *Id.* at 14.

Because NLV invokes two separate exceptions to *Noerr-Pennington* immunity, the Court analyzes the allegations supporting each exception in turn. *See Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1071 (Fed. Cir. 1998) ("Each [exception] provides its own basis for depriving a patent owner of immunity from the antitrust laws; either or both may be applicable to a particular party's conduct in obtaining and enforcing a patent."). The Court also analyzes the Ninth Circuit's "pattern" exception.

1. Sham Litigation Exception

The Supreme Court recognizes a "sham litigation" exception to *Noerr-Pennington* immunity where a litigant engages in objectively baseless litigation intended only to "interfere directly with the business relationships of a competitor."

*Eastern R. R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961). To plead the "sham litigation" exception, the party invoking it must allege that (1) "the [sham] lawsuit [is] objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits," and (2) "the baseless lawsuit conceals an attempt to interfere *directly* with the business relationships of a competitor through the use of the governmental process—as opposed to the *outcome* of that process—as an anticompetitive weapon." *PRE*, 508 U.S. at 60-61 (emphasis in original; citations omitted). Objective baselessness may be shown by demonstrating that the "infringement action [is] based on a fraudulently obtained patent." *Hydranautics v. FilmTec Corp.*, 70 F.3d 533, 538 (9th Cir. 1995) ("[i]n a case involving a fraudulently obtained patent, that which immunized the predatory behavior from antitrust liability (the patent) is, in effect, a nullity because of the underlying fraud").

NLV's sham litigation allegations relate to Smoore's attempted enforcement of the '623 Patent. For example, NLV alleges that, despite knowing that the '623 Patent was obtained fraudulently and that it could not meet the ITC's Domestic Industry economic prong requirements, Smoore pursued the ITC action nonetheless, which damaged NLV "by forcing NLV to expend substantial resources defending a case that Smoore knew or should have known was baseless from the start." CC ¶ 51. NLV also alleges that "Smoore continued to pursue [the ITC] litigation to drive out competitors, and demanded settlements that were intended to, and did, exclude competitors from the market," *i.e.*, it used the ITC process to directly interfere with the business of competitors. *See* CC ¶ 51; *see also id.* at ¶ 58 ("Smoore's attempt at using its abusive patent litigation as an economic coercion mechanism aimed at NLV's customers was successful, and NLV lost business as a result."); Opp. at 13-14.

NLV also allege the design patent underlying the Chinese action was obtained fraudulently, but NLV "has not cited, nor could the Court locate, any authority finding "sham" litigation based on foreign enforcement actions." *See Cornucopia Prod., LLC v. Dyson, Inc.*, 881 F. Supp. 2d 1086, 1102 (D. Ariz. 2012) ("What might be "objectively baseless" for a litigant suing in the United States on a United States patent might nonetheless be objectively justifiable for the same litigant suing on an otherwise identical patent in a foreign legal system—and vice versa."). In any event, as in *Cornucopia*, Smoore has succeeded in the Chinese proceedings, undermining objective baselessness. *See id.* (even if "foreign enforcement efforts could satisfy the "objectively baseless" test," "it is difficult to see how successful foreign litigation could be objectively baseless"). NLV does not address the sham litigation exception with respect to the Chinese action in its Opposition. L.R. 7-12.

NLV does not allege that the litigation before this Court meets the sham litigation exception. *See, e.g.*, CC ¶ 52 (alleging attempt to re-litigate, but not objective baselessness or fraud). NLV does not address the sham litigation exception with respect to the litigation before this Court in its Opposition. L.R. 7-12.

Thus, at this stage, NLV's allegations are sufficient to invoke the sham litigation exception as to the ITC proceedings / '623 Patent enforcement only. To the extent NLV purported to state a claim by invoking the sham litigation exception based on the litigation before this Court or the Chinese proceedings, the motion is **GRANTED-IN-PART** in that limited respect and those aspects of the claims are **DISMISSED**.[5]

## 2. Walker Process Exception

To establish *Walker Process* fraud, a plaintiff must prove: (1) "the asserted patent was acquired by means of either a fraudulent misrepresentation or a fraudulent omission" before the PTO; (2) the party enforcing the patent "must also have been aware of the fraud when bringing suit"; (3) "independent and clear evidence of deceptive intent"; (4) "a clear showing of reliance, *i.e.*, that the patent would not have issued but for the misrepresentation or omission," *i.e.*, materiality; and (5) "the necessary additional elements of [an underlying] violation of the antitrust laws." *Nobelpharma*, 141 F.3d at 1068-71 (internal quotations omitted) (citing *Walker Process*, 382 U.S. at 177-78). The parties agree that Rule 9(b)'s heightened pleading requirement applies.

Like its sham litigation allegations, NLV's *Walker Process* fraud allegations relate to Smoore's attempted enforcement of the '623 Patent. NLV alleges that (1) the '623 Patent was acquired through a fraudulent misrepresentation concerning whether the underlying application had been abandoned inadvertently; (2) Smoore knew about the scheme to acquire the patent because it was carried out by a Smoore employee; (3) the ITC ALJ's decision supports a finding of deceptive intent; (4) the patent would not have issued had the PTO not relied on the claimed inadvertent abandonment when reviving the underlying application; and (5) Smoore has violated

---

[5] The Court notes that NLV did not address leave to amend in its Opposition. If NLV believes it has a good faith basis for seeking to expand its sham litigation exception allegations in support of broadening its monopolization claim, it may seek leave to amend under the appropriate standards.

the antitrust laws by attempting to enforce the fraudulently obtained patent. *See* CC
¶¶ 21-24, 41, 43-51.

Like the sham litigation exception, NLV does not invoke the *Walker Process*
fraud exception with respect to any of the patents asserted before this Court. Nor is
the Court aware of any authority suggesting that fraud on a foreign patent office
could support a *Walker Process* claim in U.S. proceedings.

Thus, at this stage, the Court finds that NLV has sufficiently pleaded *Walker
Process* fraud with particularity as to the '623 Patent and Smoore's attempted
enforcement thereof in the ITC proceedings. To the extent NLV purported to state a
claim by invoking the *Walker Process* fraud exception based on the litigation before
this Court or the Chinese proceedings, the motion is **GRANTED-IN-PART** in that
limited respect and those aspects of the claims are **DISMISSED**.[6]

### 3.  Pattern Exception

Although Federal Circuit law applies to antitrust counterclaims concerning
patent enforcement, *see Nobelpharma*, 141 F.3d at 1067-68, the Court addresses
briefly the Ninth Circuit's exception concerning "conduct [that] involves a series of
lawsuits brought pursuant to a policy of starting legal proceedings without regard to
the merits and for an unlawful purpose." *Aventis Pharma S.A. v. Amphastar Pharms.,
Inc.*, No. 5:03-00887-MRP PLA, 2009 WL 8727693, at *7 (C.D. Cal. Feb. 17, 2009)
(noting Federal Circuit does not recognize this third type of sham litigation) (citing
*Kaiser Found. Health Plan, Inc. v. Abbott Labs., Inc.*, 552 F.3d 1033, 1044–45 (9th
Cir. 2009)). In the Ninth Circuit, this exception "applies when there is a 'series of
lawsuits and other legal actions without regard to the merits [because when] dealing
with a series of lawsuits, the question is not whether any one of them has merit—
some may turn out to, just as a matter of chance—but whether they are brought
pursuant to a policy of starting legal proceedings without regard to the merits and
for the purpose of injuring a market rival.'" *Id.* at *7 (quoting *Kaiser*, 552 F.3d at
1046). "This amounts to potential liability for a 'petitioning scheme.'" *Id.*

"Although [the Ninth Circuit] [has] not attempt[ed] to define [] the number of
legal proceedings needed to allege a "series" or "pattern" of litigation," it has ruled
that two lawsuits do not constitute a series or pattern. *Amarel v. Connell*, 102 F.3d
1494, 1519 (9th Cir. 1996) (distinguishing from precedent involving 29 actions), *as
amended* (Jan. 15, 1997).

---

[6] The Court incorporates footnote 5 as to this conclusion.

Assuming arguendo this exception can apply to patent-related antitrust claims, NLV at most alleges three lawsuits: the ITC action; the Chinese design patent litigation against NLV's supplier, not NLV; and the case before this Court. NLV did not respond to Smoore's argument that this small handful of lawsuits is insufficient to establish a series of lawsuits under the exception. *Compare* Mot. at 21-22 *with* Opp. *See* L.R. 7-12.

The Court agrees with Smoore that the three suits (assuming foreign proceedings against a supplier can be included), are insufficient to establish a pattern on these alleged facts. *See Toyo Tire & Rubber Co. v. CIA Wheel Grp.*, No. SA-CV-15246-JLS-DFMx, 2015 WL 4545187, at *3 (C.D. Cal. July 8, 2015) ("[Plaintiff's] three lawsuits and International Trade Commission activity do not constitute a 'series of lawsuits' within the meaning of the 'pattern exception.'"); *see also Amarel*, 102 F.3d at 1519.

Thus, at this stage, the Court finds that NLV has not sufficiently pleaded the pattern exception to *Noerr-Pennington* immunity. To the extent NLV purported to state a claim by invoking this exception, the motion is **GRANTED-IN-PART** in that limited respect and that aspect of the claims is **DISMISSED**.[7]

### E.  Cartwright Act

*Fifth*, Smoore argues NLV's Cartwright claim fails for the same reasons as the federal claims. Mot. at 23. The Court **DENIES** Smoore's motion as to NLV's parallel state law claim under the Cartwright Act claim for the same reasons stated above. To the extent the Cartwright claim sought to invoke the exceptions for which the Court found insufficient pleading above, the motion is **GRANTED-IN-PART** in that limited respect and those aspects of the claim are **DISMISSED**.[8]

### F.  Induced Infringement

*Sixth*, Smoore seeks dismissal of NLV's induced infringement patent counterclaim because it fails to plead pre-suit knowledge. Mot. at 24.

NLV responds that "Smoore had pre-suit knowledge of the '294 Patent through a former NLV employee who received extensive training on NLV's

---

[7] The Court incorporates footnote 5 as to this conclusion.
[8] The Court incorporates footnote 5 as to this conclusion.

intellectual property and products covered by the '294 Patent, who then joined Smoore to make videos demonstrating how to use Smoore's Accused products." Opp. at 21-22. NLV also states that it need not allege pre-suit knowledge for its indirect and willful infringement claims based on post-suit conduct. *Id.* at 22.

Pleading indirect patent infringement requires allegations sufficient to show that the alleged infringing party had knowledge of the patents at issue, as well as "knowledge that the induced acts constitute patent infringement." *Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 765–66 (2011). Under *Glob.-Tech*, "[t]o survive [a] motion to dismiss," the operative complaint "must contain facts plausibly showing that [the accused infringer] specifically intended their customers to infringe the [asserted] patent and knew that the customer's acts constituted infringement." *In re Bill of Lading Transmission & Processing Sys. Pat. Litig.*, 681 F.3d 1323, 1339 (Fed. Cir. 2012).

NLV's counterclaim for indirect infringement based on post-suit conduct sufficiently alleges that (1) "Smoore has had knowledge of the '294 Patent at least as of the filing of this counterclaim," and (2) "Smoore actively, knowingly, and intentionally induces others, including its customers and end users, to infringe one or more claims of the '294 Patent by encouraging and facilitating others to perform actions that Smoore knows to be acts of infringement of the '294 Patent . . . [which] is demonstrated by Smoore's instructions, including production and public posting of promotional videos that instruct how to use Smoore's Accused systems and packaging, and were made with the help of a former NLV employee." CC ¶ 167. Smoore's challenges turn on factual disputes that cannot be resolved at this stage.

Accordingly, for the reasons stated above concerning adequate pleading and for no other reasons not discussed, the Court **DENIES** Smoore's motion to dismiss NLV's counterclaims. To the extent the counterclaims were based on exceptions to the *Noerr-Pennington* doctrine that the Court found were insufficiently pleaded as to certain theories, the motion is **GRANTED-IN-PAR**T in that limited respect.

## G. Affirmative Defenses

Smoore moves to strike NLV's affirmative defenses as improper or insufficiently pleaded. Mot. at 24-25.

Under Rule 12(f), "[t]he court may strike from a pleading an insufficient defense." Fed. R. Civ. P. 12(f). The Court **DENIES** the portion of Smoore's motion that argues affirmative defenses attacking Smoore's prima facie case are not proper

affirmative defenses (*e.g.*, no infringement, limitation on damages, no attorney's fees). "Courts have differing views about whether these are affirmative defenses that should be in an answer, or whether they are not proper affirmative defenses." *Ecological Rts. Found. v. Hot Line Constr., Inc.*, No. 20-01108 AB (KKX), 2021 WL 1537205, at *1 (C.D. Cal. Feb. 17, 2021). "Even if they are not proper affirmative defenses, their presence in the Answer does not prejudice [Smoore]," so "[i]n the context of this case, this is an academic question upon which the Court need not expend its resources." *Id.*

As to the remaining defenses, the Court finds that they are sufficiently pleaded under Rule 8(a). This Court has expressed its view that "affirmative defense pleadings need only provide fair notice of the defense." *Vestem, Inc. v. Regen Labs LLC*, No. 2:24-cv-02475-AB-PDx, ECF No. 59 at 6 (C.D. Cal. Oct. 10, 2024) (Birotte, J.). The Court declines to resolve disputes concerning these defenses by way of striking them.

## V.    Conclusion

The Court **DENIES,** without prejudice to renewal in connection with the pretrial conference, Smoore's request to bifurcate NLV's antitrust-related counterclaims.

The Court **DENIES** Smoore's request to stay discovery concerning the antitrust-related counterclaims.

The Court **DENIES** the motion to dismiss, with the limitation that, to the extent the antitrust counterclaims were based on alleged exceptions to the *Noerr-Pennington* doctrine that the Court found were insufficiently pleaded as to certain theories, the motion is **GRANTED-IN-PART** in those limited respects.

The Court **DENIES** the motion to strike.

**IT IS SO ORDERED**.